Filed 8/12/20 (unmodified opn. attached)

CERTIFIED FOR PARTIAL PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VICTOR WARE et al.,<br><br>    Defendants and Appellants. | D072515<br><br>(Super. Ct. No. SCD255884)<br><br>ORDER MODIFYING OPINION, GRANTING REQUEST FOR PARTIAL PUBLICATION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

On July 29, 2020, we filed an order modifying the opinion filed on July 21, 2020. On July 31, 2020, we granted the People's request to partially publish the opinion. On August 5, 2020, we received Appellant Victor Ware's Petition for Rehearing and on August 10, 2020, the San Diego District Attorney requested that we publish section IV of the opinion.

We hereby grant San Diego District Attorney's request to publish section IV of the opinion. With the granting of this request, only parts I.D.E.F, II, III, and VI, of the opinion remain unpublished. We further modify the opinion as follows:

1. On page 93, after the second sentence, add as footnote 26, the following footnote:

"[26]After we issued our opinion, Ware filed a petition for rehearing raising a new issue based on Senate Bill No. 136 (Sen. Bill No. 136), which became effective January 1, 2020.  Because we have vacated Ware's sentence, Ware should raise this issue at his resentencing hearing."

2.  On page 54, delete the first sentence of the first full paragraph, and replace with the following sentence:

"Ware does not dispute that he actually possessed the Hi-Point firearm found in his sister's locked bedroom at some point because this firearm contained his DNA."

3.  Delete the paragraph commencing at the bottom of page 71 with "The primary purpose" and ending at the top of page 72, with "17 Cal.4th 148, 161, fn. 6."

4.  On page 83, delete the second sentence of the third paragraph and replace with the following sentence:

"I'm satisfied that [defense counsel's] health—he's gravely ill."

Appellant Victor Ware's petition for rehearing is denied.

There is no change in the judgment.

BENKE, Acting P. J.

Copies to:  All Parties

2

Filed 7/29/20 (mod.); Certified for partial publication 7/31/20 (order follows unmodified opinion)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>VICTOR WARE et al.,<br><br>　　　Defendants and Appellants. | D072515<br><br>(Super. Ct. No. SCD255884)<br><br>ORDER MODIFYING OPINION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed on July 21, 2020, be modified as follows:

1.  Delete the first sentence on page 5, first full paragraph, and replace with the following sentence:

> "We reverse Simpson's and Hoskins's gang conspiracy convictions, but reject appellants' remaining arguments regarding their convictions."

There is no change in the judgment.

　　　　　　　　　　　　　　　　　　　　　　　　　　BENKE, Acting P. J.

Copies to:  All Parties

Filed 7/21/20  P. v. Ware CA4/1 (unmodified opinion)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VICTOR WARE et al.,<br><br>    Defendants and Appellants. | D072515<br><br><br>(Super. Ct. No. SCD255884) |

APPEALS from judgments of the Superior Court of San Diego County, Leo Valentine, Jr., Judge.  Affirmed in part, reversed in part, and remanded for resentencing.

Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant Dionte Simpson.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant Victor Ware.

Nancy E. Olsen, under appointment by the Court of Appeal, for Defendant and Appellant Nicholas Hoskins.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

Dionte Simpson, Victor Ware, and Nicholas Hoskins (collectively appellants) are members of 5/9 Brim (Brim), a criminal street gang in San Diego that is a set of the Bloods gang. The Neighborhood Crips (NC) and West Coast Crips (WCC), (together, the Crips), other criminal street gangs, are the main rivals of the Brims. A jury found appellants guilty of the following crimes related to their gang involvement:

> Count 1 (all appellants): Between January 1, 2012 and April 23, 2014, conspired to commit murder (Pen. Code,[1] §§ 182, subd. (a), 187) for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).)
>
> Counts 2 and 3 (Simpson): June 14, 2011, attempted murder of Victims 1 and 2 (§§ 664, 187, subd. (a)) involving the personal use of a firearm (§ 12022.53, subds. (b), (c) and (e)(1)), and for the benefit of a street gang. (§ 186.22, subd. (b)(1).)
>
> Counts 4 and 5 (Simpson): June 14, 2011, assaulted Victims 1 and 2 with a firearm (§ 245, subd. (b)) for the benefit of a street gang. (§ 186.22, subd. (b)(1).)
>
> Count 6 (Simpson): April 4, 2012, participated in a criminal street gang conspiracy (§ 182.5) for the crime of premeditated attempted murder committed on or about April 4, 2012. (§§ 664, 187, 189.)
>
> Count 7 (Hoskins): August 27, 2013, participated in a criminal street gang conspiracy (§ 182.5) for the crime of premeditated attempted murder committed on or about August 27, 2013. (§§ 664, 187, 189.)

---

[1] Undesignated statutory references are to the Penal Code.

Counts 8, 12 and 13 (Ware):  January 29, 2014 and April 23, 2014, possessing a firearm by a felon.  (§ 29800, subd. (a)(1)).

Count 9 (Ware):  March 25, 2014, participated in a criminal street gang conspiracy (§ 182.5) for the crime of premeditated attempted murder committed on or about March 25, 2014.  (§§ 664, 187, 189.)

Count 10 (Ware):  March 25, 2014, first degree attempted murder (§§ 664, 187, subd. (a)) involving the personal use and discharge of a firearm (§ 12022.53, subds. (b), (c) and (e)(1)) for the benefit of a criminal street gang.  (§ 186.22, subd. (b)(1).)

Count 14 (Ware):  May 6, 2014, assault by means likely to produce great bodily injury (§§ 245, subd. (a)(4)) for the benefit of a criminal street gang.  (§186.22, subd. (b)(1).)

Ware subsequently admitted a prison prior allegation.  (§ 667.5, subd. (b)).  The court sentenced appellants to prison as follows:  (1) Ware, 27 years plus 40 years to life; (2) Simpson, 36 years plus 25 years to life; and (3) Hoskins, 25 years to life.

Appellants challenge the sufficiency of the evidence supporting their convictions for conspiracy to commit murder (count 1) and criminal street gang conspiracy (counts 6, 7, 9). Appellants also challenge the instruction regarding coconspirators' statements.  Ware asserts that the trial court erred by failing to instruct the jury that it could find multiple conspiracies existed.  Simpson, joined by Hoskins, assert that their conspiracy convictions must be reversed because the jury was allowed to consider overt acts after the conspiracy terminated and overt acts that were not proven.  Hoskins, joined by Simpson, also contend that their conspiracy convictions violated their right to free speech under the First Amendment because the court admitted evidence of their social media posts to establish participation in the alleged conspiracy.

3

Simpson challenges the evidence supporting his convictions for attempted murder (counts 2 and 3) and assault with a firearm (counts 4 and 5). Ware challenges the sufficiency of the evidence supporting the gang enhancement attached to his attempted murder conviction (count 10) and the evidence supporting one of his convictions for possessing two handguns found during the search of his residence (counts 12 and 13). He also challenges counts 12 and 13 on statute of limitations grounds. He further asserts that he received ineffective assistance when his trial counsel failed to move to suppress the gun found during his January 29, 2014, pat down search (count 8), and for conceding his guilt on all three firearm possession counts (counts 8, 12, and 13). Finally, Ware contends that the trial court incorrectly imposed sentence for both the firearm enhancement and the gang enhancement, and improperly imposed sentences for both conspiracy to commit murder and attempted murder.

Hoskins challenges the trial court's alleged rescinding of its mistrial order, and claims that the court improperly granted his *Faretta*[2] motion. Finally, Simpson and Ware seek remand to allow the trial court to exercise its discretion to strike or impose the section 12022.53 firearm enhancements attached to counts 2 and 3. Simpson and Hoskins also claim cumulative error.

---

[2]     *Faretta v. California* (1975) 422 U.S. 806.

4

We reverse Ware's and Hoskins's gang conspiracy convictions, but reject appellants' remaining arguments regarding their convictions. We agree that Simpson's and Ware's sentences must be vacated and the matter remanded for resentencing.[3]

FACTUAL BACKGROUND

We limit our summary of the factual background to the expert testimony regarding the gangs at issue, the relevant crimes of which the jury found appellants guilty, and some of the overt acts pertaining to the conspiracy convictions. Viewed in the light most favorable to the judgment, the evidence was as follows.

*Prosecution's Gang Expert*

On April 11, 2011, Dereck Peppers, a respected Brim gang member known as an "original gangster" was killed in Brim territory. Police suspected that a rival Crips gang member had murdered Peppers. Simpson and Ware knew Peppers. Peppers's murder sparked a gang war between Brim and WCC and spiked the number of homicides attributed to African-American gangs.

Appellants were Brim gang members and members of a Brim subset known as Tiny Hit Squad. Young Hit Squad was another Brim subset. At some point Tiny Hit Squad and Young Hit Squad merged, creating a commingled group known as Hit Squad. A "hit" means to kill someone. Members of the Hit Squad included appellants and alleged coconspirators, Lamont Holman, Mykein Price, Timothy Hurst, Emanuel Peavy, Damonte Lucas, Clyde

---

[3] Our conclusion that the trial court did not err renders it unnecessary to address Simpson's and Hoskin's cumulative error claim.

Ellis, Rahman Taylor, Nino Sanchez, Deondre Cooper, Leron Johnson, Jamon Smith, Edward Laplanche, Edward Paris, Aaron Hurst, Norman Sanchez, Maurice Chavarry, Sherbly Gordon, and Steven Mahaney. Brandin Orchord was also a Brim member and a member of Young Hit Squad. Jontae Jones was a member of the Hit Squad.

A gang that has been the target of a shooting by a rival gang is expected to retaliate or "get back" at the rival gang. A rival gang graffitiing in another gang's territory would also require retaliation. Failure to retaliate would make the gang appear weak and invite other gangs to prey on its members. The retaliation has to be equal to the insult suffered, but is preferably "one step above."

Blood gangs, including Brim, associate with the color red. Crips gang members traditionally wear blue. Gang members "put[] in work" for a gang by going on missions, such as committing burglaries, robberies or shootings. For shootings, gang members go into rival gang territory to seek rival gang members. A gang member on a mission might target a particular rival gang member. If the target cannot be located, the gang member will look for a substitute, such as someone dressed in the rival gang's color.

Gang members share guns. For example, in one 24-hour period the prosecution gang expert saw that one gun had been used by three different gang members. When it is time to go on a mission, a gang member will pick up a gun and pass it off to the person on the mission and then return the gun so that other gang members would have access to it. Gang members often store their guns at the home of a female who is not on parole or probation.

The gang expert reviewed a large amount of social media evidence pertaining to Brim gang members and explained to the jury how social media worked. The gang expert

6

believed that gang members in a set knew when other gang members in the same set had engaged in or were part of criminal activity as evidenced by social media posts. Gang membership does not end when an individual goes into custody. Gang members in custody still have access to cell phones and social media. Gang members also monitor rival gangs on social media.

It is common for Brim gang members to replace the letter "C" with a "K" or to place the letter "K" after the letter "C." The letter "k" after the letter "c" refers to "Crip Killer." Blood gang members also replace the letter "c" with the letter "b" when writing. For example, the word "cool" becomes "bool." "Crab," "Nap bashing," "Toasty K," "wet toast" or "west toast" are derogatory terms for NC or WCC.

*June 14, 2011 - Simpson's Attempted Murder and Assault with Firearm Convictions (Counts 2-5)*

On this day a group of five men, including Simpson, Orchord, Paris, and Chavarry started arguing with two Crips gang members on a street corner. Paris and Orchord began throwing gang signs with their hands. As the two Crips started to walk away, Simpson pulled out a gun, someone said "Fuck Crabs" and Simpson fired two or three shots. The two rival gang members fled. Simpson gave the gun to Orchord, who subsequently hid it in his garage.

After learning that the suspect group might be inside Orchord's apartment, police officers went to the apartment where they eventually contacted Orchord and Paris. Officers later found Simpson and Lucas hiding in the attic and Chavarry hiding under some clothing. Officers found a loaded revolver about a foot from where Simpson had been hiding.

Officers who responded to the scene located two expended .45-caliber shell casings in the front yard of a residence, and a bullet further down the street. During a search of Orchord's residence officers found a loaded .45-caliber semiautomatic firearm hidden in the garage. Subsequent ballistics tests linked this firearm to the shooting.

Police placed Simpson and Lucas in the back of a patrol car and the prosecution played their recorded conversation for the jury. The gang expert also interpreted some of the conversation. When Lucas commented that the police have not "found the other one," Simpson told him to shut up and explained to him why the police put them in the back of a patrol car together. This was an example of an older gang member schooling a younger one on police investigations.

When Lucas said, "they found the second one," Simpson's commented, "On Brims," asking Lucas to swear on the gang that police had found both guns. The gang expert interpreted Simpson's reply, "I got life," as an admission that he knew a gun would be linked to a shooting and there may be evidence connecting him to the shooting. Simpson and Lucas also discussed who would take the responsibility for the gun, with Simpson telling Lucas that he should accept the charge and take the hit for the gang because he was the youngest.

The garage contained Brim gang graffiti that included the gang monikers for Paris, Johnson, Chavarry, Hoskins, Orchord, Ware, and Peavy. The graffiti referenced "CK" meaning "Crip Killing" and "crab" which is a derogatory term for a Crips gang member.

*January 2012 Shootings (Overt Acts 1-5)*

On January 3, 2012, a man with a dark complexion fired shots in WCC territory and then escaped in a vehicle. Later that day, a shooting took place in Brim territory. Two days

8

later a third shooting took place in Brim territory. Bullet casings recovered from that shooting, matched the first shooting, suggesting to the expert that these shootings were consistent with "get back."

*April 1, 2012 - Murder of M.B. (Overt Acts 4-6)*

On April 1, 2012, M.B. was fatally shot. M.B., who was not a gang member, was in Crips territory while wearing all blue clothing. The gang expert considered this shooting to be a "mission" because an armed Brim gang member went to rival gang territory and shot a person without knowing whether that person was part of the rival gang. Ballistics testing conducted on cartridge casings recovered at the scene tied these casings to a nine-millimeter gun used during the shooting on April 4, 2012. Police recovered this gun on April 5, 2012, during a contact with coconspirators Norman Sanchez, Smith, and Lucas.

*April 3, 2012 - Murder of W.L.*

On this day, W.L., a nongang member, was fatally shot in the face by a Black person driving a stolen vehicle. Police later arrested coconspirator Ellis with the murder weapon.

*April 4, 2012 - Attempted Murder of T.L. (Overt Acts 7-11) and Simpson Gang Conspiracy (Count 6)*

On this day, NC gang member T.L., W.L.'s son, was shot by a memorial set up near the location of his father's shooting. Police recovered nine-millimeter casings from the scene. The casings were from two separate firearms, one of which was the same firearm used to kill M.B. three days earlier. One of the firearms was also used for return fire during the January 5, 2012 shooting.

Following their arrest for possessing a firearm, police placed Smith and Norman Sanchez in a patrol car together and recorded their conversation. Smith stated, "They found that thing," referring to the gun officers found. Later in the recording, Norman Sanchez said, "We did this ride shit for the homie." The gang expert explained that a "ride" means going on a mission for the gang. "For the homie," meant that the men did the shooting on someone's behalf, such as getting payback for a shooting that occurred in Brim territory. Norman Sanchez and Lucas later pleaded guilty to this shooting.

Police linked the nine-millimeter Beretta handgun recovered during Smith and Norman Sanchez's arrest to the April 1 and April 4, 2012 shootings. The gang expert opined that this shooting and the April 1 shooting were consistent with a gang mission because the gun was used multiple times in rival gang territory. Additionally, these shootings were committed at the beginning of the week that NC celebrated its gang, which is April 1 through 7.

On April 9, 2012, a social media status update on Hoskins's account stated, "Son was born healthy. Crossys got Hit. All I need is some Dro and my day is set. LOL. [#]Happy Easter." The gang expert explained that a "crossy" is a rival Crips gang member and that the post referenced the shooting of a Crips gang member.

*May 2, 2012 - Arrest of Simpson's Girlfriend in Possession of Firearm Linked to Three Shootings*

In the early morning hours on this day, an officer contacted Adrianna P. as she walked down the street in violation of curfew. A search of Adrianna's cell phone revealed "Blood" gang terminology in several text messages, some of which were attributed to Simpson. The

10

officer recovered a loaded nine-millimeter firearm from Adrianna's purse. Testing revealed that this gun had been used during the January 5, 2012 shooting, the January 7, 2012 shooting, and April 4, 2012 shooting.

During a police interview, Adrianna admitted that Simpson fathered her child and that he had given her the gun immediately before the officer contacted her.[4] She stated that everyone looked up to Simpson and that he got all the guns. She claimed that he passed guns to lots of people including, coconspirators Norman Sanchez, Lucas, and Paris. Adrianna stated that Simpson called Nino Sanchez "his son," and that Nino looked to Simpson as a father.

*May 11, 2012 - Murder of C.T. (Overt Acts 12-14)*

On this day, C.T., a nongang member, was in NC territory when a drive-by shooter shot and killed him. The night before C.T. was killed, a post appeared on Hoskins's social media page stating, "I'm making a lot of stupid decisions but [I don't give a fuck]. Deal with the consequences when they get here. #[you only Brim once]."

*June 4, 2012 - Recovery of Smith & Wesson Handgun from a Brim Gang Member*

On this day, police officers arrested Brim member Calvin Hunt for an outstanding warrant. After dropping Hunt off at jail for processing, officers discovered a loaded Smith & Wesson .40-caliber handgun on the floorboard of the backseat of their patrol car. The gun

---

4    During trial, Adrianna's story changed. She stated that she found the gun and decided to keep it. She admitted dating Simpson, but claimed that she did not know who fathered her child.

11

had been was used for C.T.'s murder on May 11, 2012, and contained Ellis's DNA. The gang expert concluded that the firearm was a gang gun used by multiple Brim gang members.

*June 18, 2013 - Attempted Murder of D.S. (Overt Acts 31-34)*

On this day Orchord went to D.S.'s residence with a female companion under the premise that she had a hair appointment with D.S. When D.S., who was not a gang member, opened his door, Orchord stepped out from behind his companion, said "What's up Blood," and shot D.S. in the chest.

The next day, Paris posted on his public Facebook page a photograph of Orchord, Paris, Price, and Taylor entitled "Crab say the Brims aren't here, Don't near [nigga]. Won't war with us." In the photograph, Orchord was tossing "Brim" with one hand and "Crip killer" with the other hand. Paris had a revolver pointed at a "W" made with his other hand, which disrespected WCC. Taylor had a gun in his waistband, and Price was spelling out "Blood" with his hands. The gang expert interpreted this post as a threat to rival Crips gang members, leading to possible retaliation by the Crips.

Officers sought the individuals in the photograph in different Brim locations. They located Paris and Orchord, who wore the same clothing depicted in the photograph. Simpson, Jones, another Brim member, and some girls were with them. One officer observed Jones discard a firearm in a trashcan. The gun, a .22-caliber revolver, contained Orchord's DNA and was the gun used to shoot D.S.

Officers placed Simpson and Paris in the back of a patrol car and recorded their conversation. In the recording, Simpson sounded very angry and excited. Simpson swore loyalty to Brim and referenced Hit Squad multiple times. Police took Simpson into custody

12

that day for possessing narcotics for sale and recklessly evading a police officer. He has remained in custody since that date.

*August 27, 2013 - Attempted Murder of B.T. (Overt Acts 38-42) and Hoskins's Gang Conspiracy (Count 7)*

On this date, B.T., a Lincoln Park gang member, was walking in WCC territory when a white minivan approached him. A passenger leaned out of the minivan's window and began firing in Taylor's direction. The shooter was a Black male wearing a black T-shirt with a red bandana over his face. The driver of the minivan was a Black male wearing a white T-shirt with hair braided in cornrows. Further investigation revealed that the minivan was registered to Brim gang member Timothy Hurst. Hurst was convicted for this shooting.

The gang expert stated that this shooting was consistent with a hunting mission looking for a potential rival, but the person shot at was not a rival. Officers collected .40 caliber casings from the scene. This firearm was later used in two other shootings: (1) the October 22, 2013, drive-by shooting of N.C. inside Crips territory; and (2) the October 23, 2013, shooting toward three African-American males who were inside a garage at a nearby apartment. An affiliate of WCC lived in an apartment adjacent to the garage. Police recovered the firearm used for this shooting from coconspirators Mahaney and Nino Sanchez.

Hurst's cell phone contained Hoskins's contact information. Hoskins's grandmother lived next door to Hurst's grandmother. Police found Hoskins's DNA on the passenger side interior door of the minivan. About six months before this shooting, Hoskins's social media account displayed a photograph of Hurst in front of a WCC hangout about a mile from the

13

August 27 shooting. In the photograph, Hurst was tossing up Brim and Crips killer hand signs.

On August 27, 2013, Paris's social media account displayed two photographs of Hoskins and Paris in WCC territory, also about a mile or so from the shooting location, throwing up gang signs disrespectful to Crips. On February 27, 2014, Hoskins's social media account had a post stating, "I switch up on bitckh (N word), fast. I love my bros, but I'm truer to the code shit. I turn on TB if he does some gay shit and vice versa. Nothing personal. #one Brims." The gang expert explained that Hoskins was accusing Timothy Hurst, aka Tim Brim (TB), of snitching and was saying that if somebody snitched on him, he would go after them because he was truer to the code of no snitching.

*December 14, 2013 - Attempted Murder of N.S. and T.W. (Overt Acts 61-63)*

On this day, the two victims, a WCC associate and an affiliate of a Brim rival, were shot in Brim territory. The gang expert explained that the rival gang members were shot because they "trespass[ed]" in Brim territory. He considered the shooting to be a proliferation of the war between the two rival gangs. Officers recovered 18 expended nine-millimeter casings from two firearms. They also found a loaded magazine for a semiautomatic handgun that contained Nino Sanchez's DNA.

*December 15, 2013 - Attempted Murder (Overt Acts 63-65)*

On this day two African-American males approached a residence in WCC gang territory on foot and fired shots. After the shooting, officers observed a WCC gang member yelling. The next day, Hoskins's social media account contained a post stating, "I'm tired of

14

grinding, fighting, running, jail, death, stress, betrayal, and everything else this game has to offer. But it's what we signed up for. Right?"

Officers recovered one expended .40-caliber casing and 11 expended nine-millimeter casings from the scene. Ballistics testing linked eight of the nine-millimeter casings to the firearm used in shootings that occurred on March 2, 2014, April 12, 2014, and April 15, 2014.[5] Coconspirator Peavy was charged with the April shootings and coconspirator Holman was charged with the March shooting.

Police later arrested coconspirator Price in possession of a .40 caliber semiautomatic pistol determined to be the second firearm used in this shooting and the shooting the day before. Price made a jailhouse call to coconspirator Peavy telling Peavy that he had been arrested with the gun and would take the blame for the gun.

*January 29, 2014 - Ware Arrest for Possessing a Firearm (Count 8)*

On this day, officers contacted Ware and found a loaded nine-millimeter handgun tucked into his waistband. At trial, the parties stipulated that Ware had a prior felony conviction. After his arrest, Ware made a jailhouse call to a female and talked about being arrested with a gun. He said that he needed to slow down because he was "doing a gang of shit," and was glad he only got locked up for gun possession.

---

[5] The March 2, 2014, shooting occurred in WCC gang territory toward a WCC affiliate and his girlfriend. The day before this shooting, the following message appeared on Hoskins's social media account, "I realize why they want me off the streets. I'm a loose [cannon]. Unpredictable. Threat to society and myself. LOL. [#]fucK it."

*March 25, 2014 - Ware's Attempted Murder and Gang Conspiracy Convictions (Counts 9-10 and Overt Acts 76-81)*

On the afternoon of March 25, 2014, Ware drove his gold Lexus into "the most active area" in WCC territory at the time. Based on his experience, a detective stated that this WCC territory was "absolutely" a good place to find rival WCC gang members. The passenger, a young African-American male with cornrows wearing a black hoodie fired several shots at M.W., a WCC gang member. One witness then saw the shooter get out of the car and chase M.W., while firing his weapon. This witness saw no one else on the street that could have been the shooter's target. Eight minutes after the shooting and about a mile from where it occurred, officers found the abandoned Lexus and Ware in Brim territory.

Officers collected nine-millimeter casings, all from the same firearm, from the scene. Police did not match these casings to any other shooting. Surveillance video obtained from a school showed Ware driving around WCC territory before the shooting. The gang expert opined that the shooting was gang motivated and that Ware drove around rival gang territory on a mission looking for the target rival gang member.

Inside the Lexus, officers found a letter with the name "Victor Boston" on it, which was Ware's nickname. The letter was addressed to M.H., a Lincoln Park gang member. The Lincoln Park gang is an ally of the Brim gang. The letter referenced Ware's purchase of the Lexus. In the letter, Ware states, "I'm hella triv out here, squad. I might looking at some [jail] time myself. They found two challys of mine and that little sawed-off with my print, bro." The gang expert explained that Ware was telling M.H that they found two of his guns as well as a sawed-off shotgun with his fingerprint. In the letter, Ware also wrote, "Gon'

16

learn one day. CK." Meaning people will learn about Crip Killing. Ware also wrote "I have nothing to talk about. I'll take it all on the chin. Then do it again. Brim gang." The gang expert opined that this passage meant Ware would not snitch, but he would take responsibility for the guns and do more shootings or Crip killing.

A few lines down, he said, "Bro, it's snitches in the set. I'll type weird shit, but I just wanted you to know I was out here and I got you. Get with me, bro, ASAP." Here, Ware was telling M.H. that things were weird among the gang and people in the gang might be cooperating with law enforcement. At the bottom of the letter, Ware said "I'm not on paperwork," which meant he was not on a probation or parole Fourth Amendment waiver status. Ware signed the letter "H$" and "THS" which referred to Hit Squad and Tiny Hit Squad.

*April 12, 2014 - Murder of G.B. (Overt Acts 89-94)*

On this day two men jumped out of a car and walked up to WCC gang member G.B. and his cousin. One of the men asked, "What's that Brim life like?" and both opened fire on G.B. G.B. died after being shot nine times.

Officers recovered 19 expended nine-millimeter casings from the crime scene that had been fired from two separate firearms. Testing of these casings uncovered the DNA of coconspirators Peavy and Holman. Cell phone records revealed communications between Peavy and Holman before the murder. During the investigation, law enforcement recorded a holding cell conversation between Peavy and Holman. The men discussed this murder and the finding of their DNA on the shell casings from the murder scene. Holman said, "No doubt. We fucked up, homie."

17

*April 15, 2014 - Attempted Murder of B.T. (Overt Acts 96-100)*

On this day B.T., a WCC associate and two other men were standing in an area close to WCC gang territory. A silver Ford Taurus that matched the vehicle involved in the March 2, 2014 shooting, parked nearby. A man, later identified as coconspirator Peavy got out of the driver's side of the Taurus, approached the men and asked "This is Crip? This is Crip?" B.T. responded, "Ain't nobody on no gangbanging shit out here." Peavy pulled a gun and fired at B.T., with one round hitting B.T. in the foot. Peavy ran back to the Taurus and the car sped away. Further investigation revealed that Peavy's girlfriend had rented the Taurus on February 15.

After this shooting several social media posts appeared on Hoskins's account, including one on the day of the shooting stating, "I ain't going to survive too much longer in Dago. Too much shit going on, and I can't keep my ass out of the mix." The next day, the following post appeared on Hoskins's account, "The status of an OG . . . isn't established by age or how long you been around. I mean it count but you need the stripes and reputation to match. Big homie. LOL." The gang expert explained that a gang member needs put in to work to gain OG or original gangster status.

On April 17, 2014, the following appeared on Hoskins's account, "Think about it. We all young, dumb, black, and ain't turning down shit. We all think we tough. All of us got too much pride to take a loss. What you think going to happen when we butt heads. [Bl59d]. That's what." The gang expert explained that the author had too much pride to walk away or take a loss, would not turn down a fight or gunfight, and would move forward to the end.

18

On April 20, 2014, a photograph appeared on coconspirator Gordon's social media page showing Gordon tossing up "fuck nappy heads," and captioned, "The Blood, Little Bick Nick." A status update on this account said, "It's a new Brim and town, and he mash on everybody. Ain't fucking with the Brims or him. They call him Little Bick Nick." The gang expert explained these posts announcing that Gordon had received the gang name "Little Bick Nick" and that he will fight any Brim rival. A comment on this post from Hoskins's account stated, "I'm Big Bick Nick. CKA Baby Mikey. Sherb know what's bracking. Brim bidness." The gang expert explained that Hoskins was "Bick Nick" and "Baby Mikey" and that "CKA" was a reference to Crip killing and was used instead of putting "aka." The gang expert further explained that for a young gang member to take your name, such as Gordon taking Hoskins's, there had to be a level of respect and it meant the older gang member was working towards rider or original gangster status.

## DISCUSSION

## I.

### *SUFFICIENCY OF EVIDENCE*

A. *General Legal Principles*

Where a defendant challenges the sufficiency of the evidence supporting a conviction, we examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*Ibid.*) "The same standard

19

applies when the conviction rests primarily on circumstantial evidence. [Citation.] Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court[,] that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*Id.* at pp. 1053-1054.) Reversal for insufficient evidence is warranted only when it appears that under no hypothesis whatsoever is there sufficient evidence to support the jury's verdict. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

B. *Conspiracy to Commit Murder (Count 1)*

1. Conspiracy Legal Principles

"The law of conspiracy . . . permit[s] the imposition of criminal sanctions for [an] agreement alone, plus an overt act in pursuit of it, regardless of whether the crime agreed upon actually is committed." (*United States v. Feola* (1975) 420 U.S. 671, 694.) A conspiracy conviction "requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416.)

20

" 'It is seldom possible for the prosecution to offer direct evidence of an agreement to commit a crime. The agreement to commit the crime is usually made in secrecy. The conspiracy must be inferred by the trier of fact from all the circumstances that are proven, and if the inference is a reasonable one it will not be disturbed on appeal." (*People v. Chavez* (1962) 208 Cal.App.2d 248, 253.) "Common design is the essence of a conspiracy and the crime can be committed whether the parties comprehend its entire scope, whether they act in separate groups or together, by the same or different means known or unknown to them, if their actions are consistently leading to the same unlawful result . . . ." (*People v. Means* (1960) 179 Cal.App.2d 72, 80.) Evidence is sufficient to prove an agreement " ' "if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." ' " (*People v. Maciel* (2013) 57 Cal.4th 482, 515-516 (*Maciel*).) Each member of the conspiracy is liable for the acts of other members in carrying out the common purpose of the conspiracy. (*In re Hardy* (2007) 41 Cal.4th 977, 1025.)

"While mere association does not prove a criminal conspiracy [citation], common gang membership may be part of circumstantial evidence supporting the inference of a conspiracy." (*People v. Superior Court (Quinteros)* (1993) 13 Cal.App.4th 12, 20 (*Quinteros*).) Where "the evidence establishes that a particular gang has a specific illegal objective . . . evidence of gang membership may help to link gang members to that objective." (*United States v. Garcia* (9th Cir.1998) 151 F.3d 1243, 1247 (*Garcia*).)

21

"Other than the agreement, the only act required is an overt act by *any* of the conspirators, not necessarily the defendant, and that overt act need not itself be criminal." (*People v. Smith* (2014) 60 Cal.4th 603, 616.) " '[A]n overt act is an outward act done in pursuance of the crime and in manifestation of an intent or design, looking toward the accomplishment of the crime.' " (*People v. Zamora* (1976) 18 Cal.3d 538, 549, fn. 8.) "The purpose of the overt act is simply to show that the agreement has proceeded beyond the meeting of the minds stage to some direct or physical act, however innocent in itself, tending toward the furtherance of the objective of the conspiracy." (*People v. Saugstad* (1962) 203 Cal.App.2d 536, 549-550.) A conspiracy conviction can rest on a single overt act. (*People v. Jurado* (2006) 38 Cal.4th 72, 122 (*Jurado*).)

### 2. Analysis

#### a. General introduction

The amended information alleged that appellants conspired, "[o]n or about and between January 1, 2012 and April 23, 2014" with each other and other unknown persons to commit murder. Police identified 18 other Brim gang members, who were also Hit Squad members as coconspirators. The amended information alleged the commission of 104 overt acts in furtherance of the conspiracy. The object of the conspiracy was to kill suspected rival NC and WCC gang members.

The jury convicted appellants of conspiracy to commit murder. It is undisputed that the prosecution relied exclusively on circumstantial evidence and presented no direct evidence of a conspiracy to commit murder.

22

Appellants challenge their convictions, generally contending that the prosecution presented insufficient evidence showing they entered into any agreement to commit murder, claiming their guilt was based on their gang membership and virtually nothing else. Simpson and Ware claim that the evidence did not show they possessed the specific intent to commit murder. Simpson and Hoskins also assert that their conspiracy convictions must be reversed because the jury was allowed to consider overt acts after the conspiracy terminated, and overt acts that the prosecution failed to prove. Finally, Hoskins and Simpson argue that their conspiracy convictions violated their free speech rights under the First Amendment and the California Constitution.

### b. Existence of and participation in a conspiracy

We have examined the entire record in the light most favorable to the judgment, including the relationship, interests, conduct and activities of the alleged conspirators and coconspirators before and during the alleged conspiracy. (*Maciel*, *supra*, 57 Cal.4th at pp. 515-516.) We conclude that the record supports the reasonable inference that appellants and their coconspirators tacitly came to a mutual understanding to murder rival NC and WCC gang members and that appellants participated in the conspiracy.

The prosecution gang expert was the detective investigating Brim from October 2011 through October 2015. At any given time, Brim had between 200 and 220 members. Appellants and their coconspirators were Brim gang members, and members of a Brim subset known as the Hit Squad. A "hit" means to kill someone. Some of the primary activities of Brim included murder and assaults with firearms.

The main rivals of the Brims are the Crips, specifically NC and WCC. In 2011, Peppers's murder sparked a gang war between Brim and WCC. Simpson and Ware knew Peppers. In June 2011, about two months after Peppers's death, Simpson shot at two Crips gang members and was subsequently convicted of two counts each of attempted murder and assault with a firearm.[6] With Simpson during the shooting were coconspirators Paris, Chavarry, and Lucas. Paris pleaded guilty to aiding and abetting this shooting.

Simpson argues that the June 2011 shooting cannot be considered as evidence of a conspiracy because the prosecution did not allege the shooting as an overt act and the shooting preceded the alleged start date for the conspiracy. Simpson is wrong. Incidents occurring before the start of the conspiracy may be considered as circumstantial evidence supporting the existence of the conspiracy. (*Maciel*, *supra*, 57 Cal.4th at pp. 515-516.) Notably, sometime between the date of the June shooting and February 2012, Simpson got "CK" or "Crip Killer" tattoos on his elbows.

After Adrianna's arrest in May 2012, her statements to police provided further circumstantial evidence from which the jury could infer the existence of a conspiracy to commit murder.[7] Namely, she stated that Simpson placed a gun in her purse, everybody looked up to Simpson, that he got all the guns and passed the guns to lots of people

---

[6] As discussed *post*, the evidence supports these convictions. (*Post*, pt. I.D.)

[7] Simpson's focus on Adrianna's trial testimony where she recanted her earlier statements to police is misplaced because we may not reweigh the evidence or substitute our own assessment of the witnesses' credibility for the determination made by the jury. (*People v. Snow* (2003) 30 Cal.4th 43, 66.)

including, coconspirators Norman Sanchez, Lucas, and Paris.[8] Coconspirators Norman Sanchez and Lucas pleaded guilty to the April 4, 2012, attempted murder of NC gang member, T.L. (overt acts nos. 7-11) Coconspirator Timothy Hurst was convicted of the August 2013 attempted murder of B.T., a Lincoln Park gang member who was walking in WCC territory (overt acts nos. 38-42). Although B.T. was not a rival Crips gang member, the gang expert stated that this shooting was consistent with a hunting mission looking for a potential rival, but the person shot at was not a rival. The jury convicted Ware of attempting to murder a WCC gang member in March 2014 based on his participation in this shooting (overt acts nos. 76-81). Ware's moniker, CK (Crip Killer) Vick, evidenced his motive to kill rival Crips gang members.

This evidence amply supported the jury's finding that appellants and their coconspirators entered into a tacit agreement to murder rival NC or WCC gang members. This evidence also established Simpson and Ware's participation in the conspiracy and their attempted murder convictions show that they harbored an intent to kill. (*People v. Lee* (2003) 31 Cal.4th 613, 623-624 [attempted murder "requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing" and an

---

[8] We reject Simpson's contention that Adrianna's testimony regarding putting the gun in her purse cannot be considered because it is uncorroborated accomplice testimony. The instructions required jurors to decide whether Adrianna was an accomplice to the crimes alleged against appellants. Assuming the jury found Adrianna was an accomplice, the testimony that Simpson put a gun in her purse, evidence that goes to the existence of the conspiracy, need not be corroborated. (*People v. Cooks* (1983) 141 Cal.App.3d 224, 312 (*Cooks*); *People v. Buono* (1961) 191 Cal.App.2d 203, 215-216, fn. omitted ["[T]he corroboration required by Penal Code [section] 1111 does not include the corpus delicti and is confined to the matter of connection of the individual defendant with the crime."].)

aider and abettor must share the specific intent of the direct perpetrator].)  The overt act requirement is also satisfied by Simpson's and Ware's convictions of attempted murder.[9]

As Hoskins notes, the prosecution failed to prove that he was a direct participant or aider and abettor in any of the shootings.  Nonetheless, sufficient circumstantial evidence existed from which jurors could conclude that Hoskins knew of the conspiracy and had the deliberate, knowing, and specific intent to join the conspiracy.

First, Hoskins's social media account contained references to killing and Crip killing, including photographs depicted Hoskins tossing the gang sign for Tiny Hit Squad and "CK." One title in Hoskins's social media account reads "Spell it, Bick Nick.  Tell he really about his CK's."  The gang expert explained that Hoskins was really about his Crip killing and that Hoskins's gang moniker was "Bick Nick."  A March 19, 2014, status update posted to Hoskins's account read, "My occupation:  steal, kill, and deal.  Everything got a price even your life."

---

[9]     Simpson notes that only two of the 104 overt acts named him, and out of the remaining 100 overt acts, he was in custody for 69 of them, he was not depicted in photographs or involved in any of the social media messages, and there was no evidence he knew or was aware of the social media posts.  These points are not persuasive because a conspirator need not personally participate in any of the overt acts as long as he or she conspired to commit the crime and a coconspirator committed an overt act.  (*People v. Morante* (1999) 20 Cal.4th 403, 417.)  Moreover, "[a]lthough a defendant's arrest and incarceration may terminate his participation in an alleged conspiracy, his arrest does not terminate, or constitute a withdrawal from, the conspiracy as a matter of law."  (*Cooks*, *supra*, 141 Cal.App.3d at p. 316.)  Rather, "[o]nce the defendant's participation in the conspiracy is shown, it will be presumed to continue unless he is able to prove, as a matter of defense, that he effectively withdrew from the conspiracy.  (*Ibid.*)  Simpson failed to make such a showing.

A May 20, 2014, status update on Hoskins's account read, "Gangsters don't flick it with gigs. They use it." Meaning gangsters do not take photographs with guns, they use them. In February 2012, police arrested Hoskins with coconspirator Laplanche and found a firearm tucked into Hoskins's waistband. In August 2012, an officer found a loaded .357 revolver in an area after chasing Hoskins. The jury could infer from this evidence that Hoskins carried firearms and had the intent to use them.

On April 4, 2012, two individuals shot at NC gang member, T.L. (overt acts nos. 7-11). Coconspirators Norman Sanchez and Lucas pleaded guilty to attempted murder for this shooting. Five days after this shooting, Hoskins's social media account contained an update noting that a rival Crips gang member had been shot. The jury could infer from this evidence that Hoskins's post referenced the April 4, 2012 shooting.

Coconspirator Timothy Hurst was convicted of the August 27, 2013 attempted murder of B.T., a Lincoln Park gang member who was walking in WCC territory (overt acts nos. 38-42). Photographs obtained from Paris's social medial account taken the morning of this shooting and about one mile away from where the shooting occurred, depicted Paris and Hoskins "flipping off" NC. The jury could infer from this evidence that Hoskins knew of the shooting set to occur that evening.

This evidence, when viewed with the evidence of the coconspirators' activities and Hoskins's relationship to the coconspirators, constituted sufficient evidence from which jurors could conclude that Hoskins knew of the conspiracy and had the deliberate, knowing,

and specific intent to join the conspiracy.[10]  Significantly, the jury necessarily found the evidence of interdependence among the participants in the crimes to be persuasive, having found true all of the gang enhancements against all appellants.  "[W]hile the jury must acquit [a defendant of conspiracy] if the circumstantial evidence is capable of two interpretations, one suggesting guilt and one suggesting innocence, once the jury concludes defendant is guilty that determination is upheld on appeal providing that the circumstances reasonably justify the jury's determination."  (*People v. Garcia* (2000) 84 Cal.App.4th 316, 323.)  Such circumstances exist here.

### c.  Overt acts after conspiracy ended or not proven

Simpson and Hoskins allege that their conspiracy convictions must be reversed because the court allowed the jury to consider overt acts 15, 44, 103, and 104 which were not proved or occurred after the conspiracy terminated.  They claim that the jury could have based the conspiracy convictions on one of the improperly included overt acts because the verdict form did not require that the jury reveal which overt act they found had been committed and there was no requirement that the jury unanimously agree on the same overt act to support a conspiracy conviction.  (*People v. Valdez* (2012) 55 Cal.4th 82, 154, fn. 40.)  The People argue that any error in presenting these four overt acts was harmless.  We agree with the People.

---

10    We address Hoskins's constitutional challenge to the social media evidence in part I.B.2.d., *post*.

The People alleged that the conspiracy ended "on or about" April 23, 2014. Overt acts 103 and 104 contain statements admitted as declarations of a coconspirator (Evid. Code, § 1223) that took place in May 2014, after the conspiracy allegedly ended.[11] A conspiracy usually ends when the substantive crime for which the coconspirators are being tried is either attained or defeated. (*People v. Leach* (1975) 15 Cal.3d 419, 431.) Nonetheless, it is a question for the fact-finder to determine when a charged conspiracy has ended, "considering the unique and the nature and purpose of the conspiracy of each case." (*People v. Saling* (1972) 7 Cal.3d 844, 852.)

The precise date on which an offense was committed need not be stated in an accusatory pleading unless the date is material to the offense. (§ 955.) For example, in *People v. Peyton* (2009) 176 Cal.App.4th 642 (*Peyton*), the defendant had been charged with committing certain sex offenses against a child " 'on or about October 1, 2005,' " but the evidence showed that the offenses occurred in the fall of 2004. (*Id.* at p. 660.) The appellate court upheld the convictions despite this variance, finding that "evidence is not insufficient merely because it shows the offense was committed on another date," the October 1, 2005 date was not material to any of the charged offenses, and defendant showed no prejudice. (*Ibid.*)

---

11    Overt act 103 alleged, "On or about May 9, 2014, Emanuel Peavy posed in a photograph with a firearm wearing a red 'THS' (Tiny Hit Squad) shirt with 'Brims,' and 'Fuck Crabs' on the back of the shirt.' " Overt act 104 alleged, "On or about May 10, 2014, the message, 'Fuck Wet Toast!!!!!!!!! 3-11 Till My Motherfuckin DEATH,' was posted to Leron Johnson's Facebook account."

Here, the alleged April 23, 2014 end date was not material to the conspiracy charge, nor were the jurors instructed on the beginning or end date of the conspiracy. Rather, the court instructed the jurors that the crime required the commission of one of the 104 alleged overt acts, but did not require all jurors to agree on the specific act or acts committed. Additionally, the jurors were instructed that they could only consider statements of coconspirators "made before or during the time that the defendants were participating in the conspiracy." (CALCRIM No. 418.) Thus, it was up to the jury to determine the precise end date of the conspiracy and whether the coconspirators statements alleged in overt acts 103 and 104 were part of the conspiracy.

Simpson and Hoskins next complain that the evidence did not support overt acts 15 and 44, noting that the prosecution failed to present any evidence to support overt act 15.[12] Overt act 44 alleged that "on or about October 1, 2013" Simpson and Paris posed in a photograph with Simpson displaying Crip Killer hand signs and Paris imitating shooting a gun with his hand," but this was inaccurate because Simpson was in custody on that date and could not have posed for a photograph.

We fail to discern any prejudice based on the inclusion of overt acts 15 and 44 in the instructions. The court instructed the jurors that the People were required to prove the commission of at least one overt act, but that they did not need to agree on which specific over act or acts were committed. If the evidence did not support overt acts 15 and 44, then

---

[12]    Overt act 15 alleged, "On or about June 6, 2012, Dionte Simpson posed in a video posted onto Youtube displaying Fuck Neighborhood Crips hand signs with his right hand in the shape of a gun pointed at Neighborhood Crips hand sign."

none of the jurors could not have relied on these two overt acts to support the conspiracy convictions.

### d. Right to free speech

Hoskins asserts that his conspiracy conviction violated his right to free speech under the First Amendment and the California constitution because the prosecution presented evidence of his social media postings to support the conviction as overt acts 11, 21, and 73.[13] The People contend that Hoskins forfeited this claim by failing to object to the social media evidence on this ground *post*. Even assuming the issue is properly before us, the People assert the argument is meritless because Hoskins is not being punished for his social media posts, but for a conspiracy to commit murder. We decline to deem this constitutional challenge forfeited because we easily reject the argument on its merits.

As the People correctly note, Hoskins is being punished for his participation in a conspiracy, not for his social media posts. Evidence Code section 1220 allows evidence of a statement by a declarant that is offered against him. Hoskins's social media posts qualify as an admission under this section and were admissible to prove his participation in the conspiracy. (*People v. Hardy* (1992) 2 Cal.4th 86, 142 [defendants' statements admissible to prove participation in a conspiracy].) The "admission of . . . evidence, relevant to actual criminal conduct, does not violate [a defendant's] constitutional free speech rights." (*People v. Smith* (2003) 30 Cal.4th 581, 626; *People v. Quartermain* (1997) 16 Cal.4th 600, 629

---

13 Simpson joins in this argument, asserting that Hoskins's First Amendment challenges to prosecution evidence applies equally to him.

31

["evidence [of racial epithets] was relevant to the issues being tried, and thus its use did not violate the First Amendment"].)

C. *Gang Conspiracy (Counts 6, 7, 9)*

Appellants challenge their gang conspiracy convictions under section 182.5 on different grounds. We start our discussion by reviewing the gang conspiracy statute. We then turn to a joint argument made by Simpson and Ware, before addressing each appellant separately.

1. Gang Conspiracy Legal Principles

Enacted by voter initiative, section 182.5 "created a new form of conspiracy that is distinct from the traditional understanding of the crime . . . ." (*People v. Johnson* (2013) 57 Cal.4th 250, 261 (*Johnson*).) The statute provides:

> "[A]ny person who actively participates in any criminal street gang . . . with knowledge that its members engage in or have engaged in a pattern of criminal gang activity . . . and *who willfully promotes, furthers, assists, or benefits from any felonious criminal conduct by members of that gang* is guilty of conspiracy to commit that felony and may be punished as specified in subdivision (a) of Section 182." (§ 182.5, italics added.)

In *Johnson*, our high court explained that gang conspiracy under section 182.5 differs from criminal conspiracy in five ways. (*Johnson*, *supra*, 57 Cal.4th at pp. 261-262.) First, the defendant "must be an active gang participant with knowledge of other members' pattern of criminal gang activity." (*Id.* at p. 262.) Second, a gang conspiracy requires the commission or attempted commission of felonious criminal conduct. (*Ibid.*) Third, a gang conspiracy does not require any prior agreement among the conspirators to promote, further, or assist in the commission of a particular target crime. Accordingly, "an active and

32

knowing gang participant who acts with the required intent to promote, further, or assist in the commission of a felony by other gang members can violate section 182.5. (*Ibid.*) Fourth, a gang conspiracy "requires the actual commission of felonious criminal conduct as either an attempt or a completed crime." (*Ibid.*) Fifth, a gang conspiracy includes "not only a gang member who promotes, furthers, or assists in the commission of a felony, but also an active and knowing participant who merely *benefits* from the crime's commission, even if he or she did not promote, further, or assist in the commission of that particular substantive offense." (*Ibid.*) The court explained, "[d]ue to the organized nature of gangs, active gang participants may benefit from crimes committed by other gang members. When such benefits are proven along with the other elements of the statute, section 182.5 permits those benefitting gang participants to be convicted of conspiracy to commit the specific offense from which they benefitted. (*Ibid.*)

    2. Analysis

        a. Gang conspiracy to commit attempted murder

Citing *People v. Iniguez* (2002) 96 Cal.App.4th 75 (*Iniguez*), Simpson and Ware contend that their gang conspiracy convictions must be reversed because there is no such crime as conspiracy to commit attempted murder. In *Iniguez*, the appellate court concluded that the crime of conspiracy to commit attempted murder does not exist. (*Id.* at p. 79.) The court explained that "the crime of attempted murder requires a specific intent to actually commit the murder, while the agreement underlying [a] conspiracy [to commit attempted murder] contemplate[s] no more than an ineffectual act. No one can simultaneously intend to do and not do the same act, here the actual commission of a murder." (*Ibid.*) Put

33

differently, "one cannot conspire to *try* to commit a crime" because conspiracy requires an agreement to commit a crime, not an agreement to attempt to commit a crime. (*Johnson*, *supra*, 57 Cal.4th at p. 264.)

Simpson and Ware's reliance on *Iniguez* is misplaced because traditional conspiracy, at issue in *Iniguez*, requires evidence of an agreement. (*Iniguez*, *supra*, 96 Cal.App.4th at p. 78.) Gang conspiracy, however, does not require evidence of an agreement. Rather, as our high court explained, gang conspiracy "does not contemplate an agreement to commit an ineffectual act. . . . Unlike *Iniguez*, there is no logical impossibility or absurdity in recognizing the crime of conspiracy to actively participate in a gang." (*Johnson*, *supra*, 57 Cal.4th at p. 264.) Instead, for gang conspiracy, the "act of assistance or promotion replaces the required prior agreement to commit a crime that is ordinarily at the heart of a traditional conspiracy." (*Id.* at p. 262.) Accordingly, it is possible to be guilty of a gang conspiracy to commit an attempted offense.

### b. Ware (Count 9)

The jury found Ware guilty of attempted murder and gang conspiracy arising out of the shooting on March 25, 2014, where he drove his car into WCC territory and his passenger fired a gun at a WCC gang member. Ware submits that to find him liable for gang conspiracy the jury was required to find that his passenger, the direct perpetrator of the

34

shooting, was a Brim gang member. He claims that his conviction must be reversed because the identity of the shooter was never uncovered.[14]

The People disagree, claiming we should reject Ware's interpretation that a section 182.5 crime must be committed by multiple members of the gang, because this interpretation narrows the application of the law when it was meant to expand liability. In any event, the People assert that the evidence demonstrated that Ware's accomplice in the drive-by shooting was also a Brim gang member. As we shall explain, we agree with Ware that the jury was required to find that his passenger, the direct perpetrator of the shooting, was a member of Brim, but reject his assertion that the evidence did not support this finding.

The statute requires the prosecution prove that the defendant "willfully promote[], further[], assist[], . . . any felonious criminal conduct *by members of that gang. . . .*" (§ 182.5, italics added.) Thus, the plain language of the statute requires that Ware's passenger, the shooter, be a Brim gang member. The jury instruction for this crime follows this interpretation. For Ware, the trial court instructed the jury as follows:

> "1. Defendant actively participated in a criminal street gang;
>
> "2. When the defendant participated in the gang, he knew that the members of the gang engage in or have engaged in a pattern of criminal gang activity;
>
> "3. On March 25, 2014 *members of the criminal street gang* committed Deliberate and Premeditated Attempted Murder in violation of Penal Code Sections 664/187/189;
>
> "AND

---

14      Simpson joins in Ware's argument because it supports his argument that overt acts 76 to 81 arising out of this shooting were not proven.

35

"4. Defendant willfully promoted, furthered, assisted or benefitted from, the commission of the March 25, 2014 Deliberate and Premeditated Attempted Murder *by members of the gang*." (Italics added.)

There is no evidence regarding the shooter, other than he was an African-American male with hair in cornrows. Nonetheless, based on the totality of the evidence presented during trial the jury could reasonably infer that the shooter, Ware's passenger, was a Brim gang member.

The gang expert testified that Brim and WCC were in a gang war and that Ware was part of a Brim subset known is the Hit (or kill) Squad with a number of other Brim gang members. The gang expert testified that gang members put in work for the gang by going on missions. Shooting missions involve gang members going into rival gang territory seeking a rival gang member or a substitute, such as someone dressed in the rival gang's color. The gang expert testified that gang members tend to work with people they trust.

Additionally, gang members work with " 'backup' or 'someone[] [who has] your back. No matter what happens out there, somebody, one of your trusted, one of your chosen few is going to be behind you. When shots are fired, when the fight goes down, no matter what, they're not going to turn and run and leave you hanging by yourself.' " The expert noted that gang members in the same set are expected to back each other up and that the failure to do so would result in some type of disciplinary action because failure to backup another gang member makes the set look weak. The gang expert opined that this particular shooting was gang motivated and that Ware drove around rival territory on a mission looking for a rival gang member. The expert noted that Ware and coconspirator Nino Sanchez were arrested

36

together in August 2009 in a stolen car. Ware was also arrested in 2010 with coconspirator Holman.

Brim and Crips gang members were in a gang war. The gang expert testified that this particular shooting, targeting a WCC gang member, was a gang mission, that gang members take "backup" and these individuals are people that the gang member trusts. From this evidence, the jury could reasonably infer that Ware drove a trusted Brim gang member into rival gang territory to commit the shooting. Accordingly, we reject Ware's argument that the evidence failed to support his gang conspiracy conviction.

c. Simpson (Count 6)

The jury found Simpson guilty of gang conspiracy arising out of a shooting on April 4, 2012, where two individuals shot NC gang member T.L. while he stood near a memorial set up for his father, who had been murdered in a drive-by shooting the day before. Brim gang members Norman Sanchez and Lucas later pleaded guilty to this shooting. Simpson argues that his gang conspiracy conviction must be reversed for two reasons. First, he contends that the nature of Norman Sanchez's and Lucas's convictions was not presented to the jury; thus, there was no prior jury finding that the crime of premeditated and deliberate attempted murder was committed on April 4, 2012. Second, he argues that there is no evidence he willfully participated, promoted, assisted, or benefited from the April 4, 2012 shooting in any manner.[15] He asserts we should reject any argument that he benefitted from

_____

[15] The only evidence of Simpson's possible involvement in this shooting is the fact that Simpson drove a gold colored Lexus, and the statement of a witness that he saw a gold car in the area and that the shooters ran in the direction of the gold car. This same witness testified that the men got into a tan or white '90s model Ford Crown Victoria.'

the shooting without doing anything to obtain that benefit because such a finding would condemn him for his associations, not for his actions.

The People ignore Simpson's first argument, which we conclude is dispositive. Accordingly, we need not address whether Simpson willfully promoted, furthered, assisted, or benefited from the April 4, 2012 shooting.

The prosecution must prove that the defendant "willfully promote[d], further[ed], assist[ed], or benefit[ed] from *any felonious criminal conduct* by members of that gang. . . ." (§ 182.5, italics added.) Regarding this element, the court instructed the jury that to find Simpson guilty of gang conspiracy it must find that "[o]n April 4, 2012, members of the criminal street gang committed Deliberate and Premeditated Attempted Murder in violation of . . . Sections 664/187/189." The elements of attempted murder are "specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) "[A]ttempted murder and premeditated attempted murder are the same offense." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1049.) Premeditation constitutes a penalty provision that prescribes an increase in punishment, but this " 'penalty provision is separate from the underlying offense and does not set forth elements of the offense or a greater degree of the offense charged.' " (*Ibid.*)

To convict Simpson of gang conspiracy the jury needed to find that the April 4, 2012 shooting was an attempted murder committed by a Brim gang member. While it is

_____

Additionally, about a month after this shooting Simpson gave the gun involved in this shooting to his girlfriend. The girlfriend stated the Simpson passed guns to lots of people.

38

undisputed that Norman Sanchez and Lucas were Brim gang members, there is no evidence in the record regarding to what crime these individuals pleaded guilty, or whether this crime constituted a felony. It is not within the common knowledge of laypersons to be able to determine from the testimony to what crime Norman Sanchez and Lucas pleaded guilty, or whether that crime constituted a felony. Without any evidence regarding the nature of the crimes committed by these Brim gang members the jury is left with speculation. " 'But speculation is not evidence, less still substantial evidence.' " (*People v. Waidla* (2000) 22 Cal.4th 690, 735.) The lack of evidence regarding the nature of Norman Sanchez's and Lucas's convictions constitutes a failure of proof regarding an element of the crime of gang conspiracy. Accordingly, Simpson's gang conspiracy conviction must be reversed. (*People v. Diaz* (2005) 125 Cal.App.4th 1484, 1490-1491 ["The prosecution bears the burden of proving all elements of the offense, and must persuade the fact finder beyond a reasonable doubt of the facts necessary to establish those elements."].)

### d. Hoskins (Count 7)

#### i. Additional background

The jury found Hoskins guilty of gang conspiracy arising out of a shooting on August 27, 2013, where a white minivan approached B.T., a Lincoln Park gang member walking in WCC territory, and the minivan's passenger, who wore a red bandana over his face, fired a gun in B.T.'s direction. Further investigation revealed that the minivan was registered to Brim gang member Timothy Hurst and Hurst was later convicted for this shooting.

During opening statement, the prosecutor told the jurors that he would present Timothy Hurst's free talk and that Hurst would testify at trial about the information he

39

provided in that free talk. He claimed that Timothy Hurst would testify that Hoskins instigated the shooting because the Crips had disrespected Brim by coming into Brim territory to take photographs, that Nino Sanchez was the shooter in the red bandana and Hoskins was a back seat passenger.

Ultimately, Timothy Hurst refused to testify, was held in contempt, and none of the evidence from the free talk was presented at trial. During closing argument, the prosecution used social media postings and Hoskins's contact with, B.T., the victim of the shooting *after* Timothy Hurst's arrest to support the gang conspiracy charge. Specifically, the evidence against Hoskins consists of the following:

> About six months before the August 27 shooting, Hoskins was in WCC territory, about a mile from where the shooting occurred, and he posted on social media a photograph of Timothy Hurst tossing up Brim and Crip killer hand signs. The morning of August 27 a posting on fellow gang member Paris's social media account showed two photographs of Hoskins and Paris in the same location making gang-related hand signs, including flipping off WCC.

> The unknown shooter wore a red bandana around his face. At some unknown time a photograph was posted on Hoskins's social media account showing Hoskins with a bandana over his face captioned, "Rags around our face to beat the case in case the N word look 5/9 Brim gang. Nap bashing. Toe smashing. 3k, 4k, YH[$]." The gang expert interpreted the caption as meaning you should hide your face in case another person sees you. Nap bashing means bashing in NC. Toe smashing means smashing on WCC. 30k references WCC and 40k represents NC. The YHS with the dollar sign means Young Hit Squad.

> The gang expert stated that Timothy Hurst and Hoskins grew up next to each other and concluded that the men were "extremely close friends." Hoskins's DNA was found on the passenger side of Hurst's minivan. After Hurst's arrest, Hoskins and Hurst's girlfriend

40

discussed the case against Hurst that included photographs of witness statements by B.T., the shooting victim.

Hoskins reached out to B.T., the shooting victim, through social media asking him not to testify so that Hurst could beat the case. The response from B.T.'s account read, "I'm not testifying on Blood what the paperwork say?" The expert explained the response as swearing on the gang to not testify. This was followed by a series of communications between the two accounts culminating with the person using the Hoskins account to challenge and then threaten the person using B.T.'s account.

ii. Analysis

To establish Hoskin's guilt of gang conspiracy the prosecution was required to prove that Hoskins "willfully promote[d], further[ed], assist[ed], or benefit[ed] from *any felonious criminal conduct* by members of that gang. . . ." (§ 182.5, italics added.) Regarding this element, the court instructed the jury that to find Hoskins guilty of gang conspiracy it must find that "[o]n August 27, 2013, members of the criminal street gang committed Deliberate and Premeditated Attempted Murder in violation of . . . Sections 664/187/189." Although the record established that Timothy Hurst was a Brim gang member, we located no evidence in the record of what crime Timothy Hurst pleaded guilty regarding this shooting.

We requested and received supplemental briefing from the parties on: (1) whether the jury received any evidence informing them of what crime Timothy Hurst pleaded guilty as related to his involvement in the August 27, 2013 shooting; and (2) assuming the jury received no evidence informing them of what crime Timothy Hurst pleaded guilty as related to his involvement in the August 27, 2013 shooting, whether sufficient evidence supports the jury's verdict against Hoskins on Count 7, gang conspiracy.

41

All parties agree that the jury received no evidence informing them of what crime Timothy Hurst pleaded guilty as related to his involvement in the August 27, 2013 shooting. Hoskins claims that this omission requires his gang conspiracy conviction be reversed because the evidence fails to show that any Brim gang member suffered a felony conviction related to this shooting. We agree. (See *ante*, pt. I.C.3.c.) Based on this failure of proof, we reverse Hoskins's gang conspiracy conviction.

D. *Simpson's Attempted Murder and Assault Convictions (Counts 2-5)*

Simpson challenges the sufficiency of the evidence supporting his convictions for attempted murder (counts 2 and 3) and assault with a semi-automatic firearm (counts 4 and 5) arising from the June 14, 2011 shooting. He claims the evidence does not establish that he was the shooter and intended to kill, or that he aided and abetted the shooting. Specifically, he argues that T.J., an accomplice and admitted liar, was the only witness to identify him as the shooter, claiming that all other witnesses gave differing descriptions of the shooter.

Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. (*People v. Ervine* (2009) 47 Cal.4th 745, 785.) Attempted murder also requires express malice, meaning the assailant desires the victim's death or knows to a substantial certainty that the victim's death will occur. (*People v. Booker* (2011) 51 Cal.4th 141, 178.) "Intent to unlawfully kill and express malice are, in essence, 'one and the same.' " (*People v. Smith* (2005) 37 Cal.4th 733, 739.) Intent to kill may be inferred from the defendant's acts and the circumstances of the crime. (*Id.* at p. 741.) "The act of shooting a firearm toward a victim at close range in a manner that could have inflicted a mortal wound had the shot been on target is sufficient to support an

inference of an intent to kill." (*People v. Houston* (2012) 54 Cal.4th 1186, 1218.) The circumstance that the bullet misses its mark or fails to prove lethal is not dispositive. (*Smith*, at pp. 741-742.) Attempted murder does not necessarily require a specific target and an indiscriminate would-be killer who fires into a crowd is just as culpable as one who targets a specific victim. (*Houston*, at p. 1218.)

To support a conviction, accomplice testimony must be corroborated by independent evidence which, without aid or assistance from the accomplice's testimony, tends to connect the defendant with the crime charged. (*People v. Szeto* (1981) 29 Cal.3d 20, 27.) " 'Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. [Citations.] It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified. [Citations.] It is "sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." ' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 95.) " 'The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime.' " (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32-33.)

We are satisfied that substantial evidence supports Simpson's attempted murder and assault convictions. T.J. admitted that on the day of the shooting she lied when she told an officer that she had not seen anything. During her police interview, which took place three years before she entered witness protection, T.J. identified Simpson as the shooter. She claimed that Orchord was in the bathroom during the shooting and that he ran outside after

the shooting. During trial, T.J. similarly stated that Simpson was the shooter, that Orchord was in the bathroom during the shooting and that he ran outside after the shooting.

Assuming the jury found T.J. was an accomplice, the testimony of other witnesses sufficiently corroborated T.J.'s testimony that Simpson was the shooter. Brenda, a neighbor who knew Orchord, also testified that Orchord was not outside during the initial argument. After the shooting, T.J. saw Simpson give the gun to Orchord who then hid the gun inside the garage. Police found a firearm in the garage and ballistics testing linked this firearm to the shooting.

The witnesses who observed the altercation on the street testified inconsistently regarding the physical appearance of the shooter. We examined this testimony in depth and focused on the consistencies in the testimony, which described a person meeting Simpson's physical description.

A police officer who was patrolling the area 30 minutes before the shooting saw Paris and Simpson hanging out with a group of Brim gang members in front of Orchord's garage. All the men wore blue jeans and T-shirts, including Simpson who wore a white T-shirt. The officer stated that Simpson did not have a full beard and described him as about 180 to 190 pounds with short black hair. Raymond, a school worker, heard the argument. He heard the shooter say "fuck that, fuck that" followed by two gunshots. After the shooting and at trial, he described the shooter as an African-American man in his 20's with a muscular build.

Maritza, a neighbor, also heard the argument. She described the shooter on the day of the incident as about 5 feet 10 inches tall and weighs 220 pounds with a full beard. Police

44

photographed Paris, Orchord, Chavarry, Lucas, and Simpson after the shooting. While Paris, Orchord, Chavarry, Lucas were relatively clean shaven, Simpson had sufficient stubble on his face to be construed as a full beard.

Carlos, a construction worker, heard the argument. He described the shooter as about 5 feet 10 inches or 5 feet 11 inches tall and weighing about 220 to 230 pounds. He did not mention the shooter's hairstyle to the officer. Elizabeth, another school worker, looked outside her second floor window after hearing the argument and described the shooter as an African-American man in his mid-20's, with very short hair, about 5 feet 7 inches or 5 feet 8 inches. She later described the shooter as being tall.

On the day of the shooting, Simpson had short hair. One officer who observed the Brim gang members after their arrests described Simpson as the largest and "[d]efinitely the most muscular" of the group. This officer described Lucas, who also had short hair, as about 5 feet 7 inches tall and 160 pounds. He described Paris and Orchord as being about the same height as Lucas, with Orchord having a medium build, while Paris was thinner than Lucas and had his hair in braids. Although police detected no gun shot residue on Simpson after his arrest, Simpson had sufficient time to change clothes and thus had sufficient time to wash his hands.

T.J.'s corroborated testimony supported the verdicts against Simpson on the attempted murder and assault charges. (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 366 [testimony of a single witness may support a judgment, "even if it is contradicted by other evidence, inconsistent or false as to other portions."].) Additionally, the testimony of the other eyewitnesses suggests that Simpson, the largest man of the group, was the shooter.

45

"Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403.)[16]

E. *Ware's Gang Enhancement (Count 10)*

Ware challenges the sufficiency of the evidence supporting the gang enhancement connected to his March 25, 2014, attempted murder conviction (count 10). He claims the evidence does not establish that (1) the shooting was directed by, for the benefit of, or in association with, the Brim gang; and conducted with the specific intent to further criminal conduct by gang members. . . . The People disagree, claiming the evidence shows Ware committed the crime for the benefit of the Brim gang and in association with another Brim gang member, with the necessary specific intent.

Section 186.22, subdivision (b)(1) prescribes a sentencing enhancement for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or

---

[16]    In a passing argument, Simpson claims the evidence does not support the finding that he intended to kill the victims because the shooting did not take place from close range. We are not persuaded by this argument.

One witness described the distance between the two groups as "30 feet max." Another witness described the distance between the shooter and his intended targets as 15 to 20 feet. " 'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . ." ' " (*Smith, supra,* 37 Cal.4th at p. 741.) " '[T]he crime of attempted murder requires no physical injury to the victim. . . .' " (*People v. Bland* (2002) 28 Cal.4th 313, 328-329.) Moreover, these same two witnesses described the victims as retreating. "[F]iring at a fleeing victim reasonably reflects an intention to kill." (*People v. Bolin* (1998) 18 Cal.4th 297, 319.)

46

assist in any criminal conduct by gang members."  A gang enhancement under this statute contains two distinct prongs.  (*People v. Albillar* (2010) 51 Cal.4th 47, 59 (*Albillar*).)  The first prong requires a finding that the crime was "gang related" in the sense of being for the benefit of, at the direction of, or in association with a gang.  (*Id.* at p. 67.)

The second "specific intent" prong of the enhancement requires "that a defendant commit the gang-related felony 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.' "  (*Albillar*, *supra*, 51 Cal.4th at p. 64), and "applies to *any* criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced."  (*Id.* at p. 66.)

" 'In order to prove the elements of the criminal street gang enhancement, the prosecution may . . . present expert testimony on criminal street gangs.' [Citation.]  ' "Expert opinion that particular criminal conduct benefited a gang" is not only permissible but can be sufficient to support [a] gang enhancement.' [Citations.]  While an expert may render an opinion assuming the truth of facts set forth in a hypothetical question, the 'hypothetical question must be rooted in facts shown by the evidence.' [Citation.]  Indeed, an 'expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors." ' [Citations.]  [¶]  As for the specific intent prong, ' "[i]ntent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." ' [Citation.]  [T]he scienter requirement may be satisfied with proof 'that the defendant intended to and did commit the charged felony with known members of a gang,' from which 'the jury may fairly infer that the defendant had the

specific intent to promote, further, or assist criminal conduct by those gang members.' "

(*People v. Franklin* (2016) 248 Cal.App.4th 938, 948-949.)

Turning to the first prong, Ware contends that the evidence does not support the jury's implied findings that that the shooter was a Brim gang member, or that the target of the shooting was a Brim rival. He complains that the prosecution elicited the gang expert's testimony regarding this shooting by lumping together the facts of four separate shootings. He claims the most one can conclude is that he drove an unidentified person into WCC territory and the passenger shot at another unidentified person. We disagree.

We agree that the prosecutor asked the gang expert a lengthy hypothetical question combining the facts of several shootings, including the March 25, 2014 shooting. The prosecutor, however, then followed-up with several additional hypothetical questions, including one paralleling the facts of the March 25, 2014 shooting.

In response to the hypothetical tracking the facts of the March 25, 2014 shooting, the gang expert opined that such a shooting benefited the active participants in the Brim gang because the driver has "gone out and . . . done a ride" by taking a partner into rival territory to shoot at a rival gang member. The driver has "put in work. . . . [D]one a ride for your set. The question is now do you snitch. And if you hold true, [the driver] has done [his] job." Earlier in his testimony the gang expert opined that an attempted murder and assault with a firearm of a Brim rival by a Brim gang member benefits the Brim gang because it displayed gang strength—possessing a weapon and the willingness to commit "a vicious and violent crime using a firearm."

An expert may properly "express an opinion, based on hypothetical questions that track[] the evidence, whether the [crime], if the jury found it in fact occurred, would have been for a gang purpose. 'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . section 186.22, subdivision (b)(1), gang enhancement." (*People v. Vang* (2011) 52 Cal.4th 1038, 1048 (*Vang*).) As Ware admits, "[e]xpert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient" to prove the "benefit" element of the gang enhancement. (*Albillar*, *supra*, 51 Cal.4th at p. 63.)

Finally, two witnesses to the shooting testified that the shooter, Ware's passenger, targeted M.W., a WCC gang member. This evidence supported a finding that Ware committed the March 25, 2014 shooting for the benefit of the Brim gang. (See *Vang*, *supra*, 52 Cal.4th at p. 1048.) Additionally, the evidence supports the inference that Ware participated in the shooting in association with a Brim gang member. (*Ante*, pt. I.C.3.b.)

Turning to the second prong, "[t]he scienter requirement in section 186.22[, subdivision] (b)(1) . . . applies to *any* criminal conduct." (*Albillar*, *supra*, 51 Cal.4th at p. 66.) Here, the gang expert testified that shooting rival gang members not only builds your status within the gang, but also creates fear in the general community. He explained that the general community understands that police cannot provide protection all the time and that gang members willing to shoot rivals are also willing to "get back" at a witness who snitches. This fear allows the gang to continue within the community. Based on his experience, the gang expert stated that general community fear makes it less likely that community members will report crimes.

49

The expert also explained that a gang member builds up the gang's reputation by committing crimes against a rival gang and that these acts then impact the ability of the rival gang to recruit members because "nobody wants to be part of a losing team." Additionally, participating in a shooting against a rival gang member adds credibility to gang member's social media posts: "[W]e're actually going out there and doing it. I mean we're not talking about this and just turning around and walking away. We're not [social media] gangsters. We're real gangsters. We're in the street. We're doing what we do, and we're still going to talk about it." Based on the gang expert's testimony, the jury could reasonably infer that Ware carried out the attempted murder intending to (1) assist fellow gang members commit future crimes thereby enabling the Brim gang to recruit new members and, (2) instill fear in the community to reduce community cooperation with law enforcement.

For these reasons, we conclude that substantial evidence supports the jury's true findings on the gang enhancement allegation attached to count 10.

F. *Ware Gun Possession (Counts 12 and 13)*

1. Additional Background

On April 23, 2014, at about 5:00 a.m., officers executed a search warrant at Ware's apartment. SWAT officers used a bullhorn to call out the occupants of the apartment. Ware's mother came out and said that other people were inside, but no one else exited the apartment. After 20 minutes of unsuccessfully calling out the other occupants, SWAT officers used a "flash bang" to clear the apartment. Ware, his sister, half-brother, and younger female friend of the family then came out of the apartment.

50

After entering the apartment, officers found the door to the sister's bedroom locked and forced entry into that room. Inside the sister's bedroom, officers found two handguns, a .40 caliber Hi-Point handgun and a Ruger. The loaded Hi-Point was hidden between the mattress and box springs. The Hi-Point firearm contained Ware's DNA. Officers found the unloaded Ruger inside a dresser drawer. The Ruger was one of the stolen handguns from the January 29, 2014, residential burglary involving Nino Sanchez. The DNA results from the Ruger handgun were too low for comparison. Neither gun was connected to any of the shootings at issue in this case.

Counts 12 and 13 charged Ware with possession of a firearm by a felon. The information and the verdict forms did not designate which gun was associated with each count. During trial, defense counsel conceded Ware's guilt on both counts, stating that Ware constructively possessed the guns found in his sister's bedroom. For purposes of analysis, we designate count 12 as pertaining to the Ruger firearm and count 13 as pertaining to the Hi-Point firearm.

2. Gun Possession (Count 12 (Ruger))

Ware contends that the evidence does not support the inference that he actually or constructively possessed the Ruger handgun because it was found in his sister's bedroom and did not contain his DNA.[17] He notes that the prosecution presented no evidence showing he lived at the apartment and that he had access, the right to access, or the means to access his

---

[17]    Simpson joins in this argument because it supports his contention that overt acts numbers 70 and 71 were not supported by the evidence.

sister's room without her assistance and consent.  He acknowledges that his counsel conceded his guilt to this count during closing argument, but claims this concession does not bar sufficiency of the evidence review.  Assuming this court concludes that defense counsel's concession forfeited the sufficiency of the evidence challenge, he contends that his attorney rendered constitutionally ineffective assistance of counsel.

As a preliminary matter, we note that the Attorney General did not respond to the sufficiency of the evidence issue as having been forfeited by defense counsel's concession during closing argument.  "Two of the most basic premises of our criminal justice system" are "the presumption of innocence and the duty of the prosecution to prove guilt beyond a reasonable doubt." (*People v. Belton* (1979) 23 Cal.3d 516, 520.)  "Implicit in these principles is the duty of the prosecution to prove each element of the crime charged.  'One of the greatest safeguards for the individual under our system of criminal justice is the requirement that the *prosecution must establish a prima facie case by its own evidence before the defendant may be put to his defense*.' " (*Ibid.*)  Any concession by defense counsel during closing argument did not alter this fundamental duty.  Indeed, a challenge to the sufficiency of evidence is forfeited in the trial court only by failure to file a timely notice of appeal. (*People v. Rodriguez* (1998) 17 Cal.4th 253, 262.)  Accordingly, we turn to the merits of Ware's contention.

The elements of the crime of being a felon in possession of a firearm are conviction of a felony and ownership or knowing possession, custody, or control of a firearm.  (Pen. Code, § 29800, subd. (a)(1); CALCRIM No. 2510.)  Ware does not dispute that he had suffered a prior felony conviction.  He challenges his conviction on the ground insufficient evidence

showed he constructively possessed the Ruger firearm found in his sister's locked bedroom because it did not contain his DNA.

"Possession may be either actual or constructive as long as it is intentional." (*People v. Spirlin* (2000) 81 Cal.App.4th 119, 130.) " 'Constructive possession occurs when the accused maintains control or a right to control the contraband; possession may be imputed when the contraband is found in a place which is immediately and exclusively accessible to the accused and subject to his dominion and control, or to the joint dominion and control of the accused and another. . . . The elements of unlawful possession may be established by circumstantial evidence and any reasonable inference drawn from such evidence." (*People v. Busch* (2010) 187 Cal.App.4th 150, 162.) "[T]here is no single factor or specific combination of factors which unerringly points to possession. . . . [T]he question of possession turns on the unique factual circumstances of each case." (*People v. Land* (1994) 30 Cal.App.4th 220, 228.)

"Constructive possession means the object is not in the defendant's physical possession, but the defendant knowingly exercises control or the right to control the object." (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 831.) "Dominion and control" cannot be inferred from the defendant's mere proximity or access to the weapon. (*People v. Zyduck* (1969) 270 Cal.App.2d 334, 336.) "[S]omething more must be shown. . . ." (*Ibid.*) Nonetheless, "the necessary additional circumstances may, in some fact contexts, be rather slight." (*Ibid.*) That slight, something more, exists here.

Police found Ware in the apartment at 5:00 a.m. with his mother, sister and half-brother. From these facts, jurors could reasonably infer that Ware resided at the apartment.

53

After officers announced their presence to execute a search warrant, Ware's mother exited the residence while Ware, his sister and two others remained inside for 20 minutes knowing that officers were there to search the residence for contraband. Before Ware's sister and the other occupants exited the residence someone actively used the lock on the sister's bedroom door to exclude officers from this room.

Ware does not dispute that he constructively possessed the Hi-Point firearm found in his sister's locked bedroom because this firearm contained his DNA. The lack of Ware's DNA on the Ruger firearm does not necessarily show the opposite; rather, we must examine the unique circumstances of this case. The existence of the Hi-Point firearm in his sister's bedroom shows that Ware had access to this room and suggests that he shared dominion and control of this room with his sister. (*People v. Rushing* (1989) 209 Cal.App.3d 618, 622 ["A defendant does not avoid conviction if his right to exercise dominion and control over the place where the contraband was located is shared with others."].) Additionally, the Ruger firearm was one of the stolen handguns from the January 29, 2014 residential burglary involving Nino Sanchez, Ware's fellow Hit Squad member. Finally, the gang expert testified that gang members store their guns where officers do not have ready access. The locked bedroom of a family member counts as such a location.

We find that sufficient evidence existed from which a rational trier of fact could reasonably infer that Ware knowingly exercised control, or the right to control the Ruger firearm, and therefore constructively possessed it. Accordingly, the evidence supports his conviction for being a felon in possession of the Ruger firearm.

54

3. Statute of Limitations Defense (Count 13 (Hi-Point))

Ware concedes that the evidence shows he actually possessed the Hi-Point handgun at some point because police found his DNA on this weapon. He argues, however, that there was no evidence that he possessed the Hi-Point gun within the statute of limitations period for this offense. He claims that he did not forfeit this issue because it pertains to the sufficiency of the evidence to support the charge. Assuming we find this issue forfeited by failure to raise it below, Ware submits his defense attorney rendered ineffective assistance by failing to raise this issue and by conceding his guilt given the existence of a viable defense to the charged possession.

The People argue that Ware forfeited this issue because the information was not untimely on its face. Even assuming the issue is not forfeited, the People contend that substantial evidence supports a finding that the offense was committed within the statute of limitations period. We agree with the People that substantial evidence shows that the prosecution of this charge was timely. Accordingly, we decline to address the forfeiture argument to avoid Ware's secondary argument that defense counsel was constitutionally ineffective for failing to raise this issue, and proceed to the merits.

"A felony prosecution commences for statute of limitations purposes when an indictment or information is filed, or an arrest warrant or bench warrant issues . . . ." (*People v. Castillo* (2008) 168 Cal.App.4th 364, 366.) The prosecution bears the burden of proving an offense occurred within the applicable statute of limitations period by a preponderance of the evidence. (*Id.* at p. 369.) The crime of illegal firearm possession

55

by a felon is a felony subject to a three-year statute of limitations. (§§ 18, 801, 29800, subd. (a)(1).)

Here, the prosecution commenced upon the filing of the original information on December 18, 2014, charging Ware with the possession "[o]n or about April 23, 2014." Accordingly, to meet its burden, the prosecutor needed to prove that Ware possessed the Hi-Point handgun at some point after December 18, 2011. Ware claims that the prosecutor failed to meet this burden because there is no evidence when he physically possessed the Hi-Point firearm and deposited his DNA on it, and the prosecution failed to establish he had constructive possession of this weapon on April 23, 2014, when police found the gun in his sister's bedroom. As discussed *ante* regarding the Ruger firearm, the presence of the Hi-Point firearm on April 23, 2014 in his sister's bedroom, established Ware's constructive possession of this weapon. (*Ante*, pt. I.F.2.) Accordingly, the evidence sufficiently showed that Ware's possession of the Hi-Point handgun occurred within the limitations period.

## II.

### *ALLEGED INSTRUCTIONAL ERROR*

A. *CALCRIM No. 418*

1. Additional Background

The information identified numerous overt acts which contained statements of oral or written expression, or nonverbal conduct. The court admitted some of the statements under the admissions of a coconspirator exception to the hearsay rule. (Evid. Code, § 1223.) The trial court, without objection, instructed with CALCRIM No. 418, which provided:

56

"**In deciding whether the People have proved that the defendants committed the crime charged, you may not consider any statement made out of court by** Edward Paris, Leron Johnson, Nicholas Hoskins, Dionte Simpson, Victor Ware, Damonte Lucas, Norman Sanchez, Emanuel Peavy, Lamont Holman, Maurice Chavarry, Sherbly Gordon, Steven Mahaney, Rahman Taylor, Deandre Cooper, Jamon Smith, Nino Sanchez, Mykein Price, Timothy Hurst, Clyde Ellis, Edward Laplanche, Aaron Hurst,[18] or **unless the People have proved by a preponderance of the evidence that**:

"1. Some evidence other than the statement itself establishes that a conspiracy to commit a crime existed when the statement was made;

"2. [The co-conspirators] were members of and participating in the conspiracy when they made the statement;

"3. [The co-conspirators] made the statement in order to further the goal of the conspiracy; [¶] AND

"4. The statement was made before or during the time that the defendants were participating in the conspiracy.

"A *statement* means an oral or written expression, or nonverbal conduct intended to be a substitute for an oral or written expression. [¶] *Proof by a preponderance* of the evidence is a different standard of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] You may not consider statements made by a person who was not a member of the conspiracy even if the statements helped accomplish the goal of the conspiracy. [¶] You may not consider statements made after the goal of the conspiracy had been accomplished." (Bolding added.)

---

18    We collectively refer to these individuals as "the coconspirators."

2. Analysis

Appellants contention that CALCRIM No. 418 informed the jury that their intent and the coconspirator's statements could be proved by a preponderance of the evidence which violated their constitutional right to due process by lessening the prosecution's burden of proof. Simpson asserts that this erroneous instruction affected his substantial rights so that we should reach the merits of his claim despite defense counsel's failure to object. The People assert that appellants forfeited this claim by failing to object to the instruction at trial. In any event, the People claim that the instructions as a whole properly instructed the jury on the prosecution's burden of proof. We consider appellants' arguments on their merits because "[a]scertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.)

We review a claim of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) We "first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys. The test is whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585.) Where the "determination of error depends on the meaning communicated by an instruction, we must ascertain how a hypothetical 'reasonable juror' would have, or at least could have, understood the words in question." (*People v. Mickey* (1991) 54 Cal.3d 612, 670.) " ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' " (*People v. Musselwhite* (1998)

58

17 Cal.4th 1216, 1248.) Additionally, we must interpret the instructions at issue to support the judgment rather than defeat it, so long as the instructions are reasonably susceptible of such an interpretation. (*People v. Sy* (2014) 223 Cal.App.4th 44, 59.)

"Evidence Code section 1223 provides an exception to the hearsay rule as to statements made during the existence of a conspiracy that are in furtherance of its objective." (*People v. Herrera* (2000) 83 Cal.App.4th 46, 59.) CALCRIM No. 418 is tied to Evidence Code section 1223 and must be given when a coconspirator's statement has been admitted under Evidence Code section 1223.[19] (Judicial Council of Cal. Crim. Jury Instns. (2018), Bench Notes to CALCRIM No. 418, p. 219.) CALCRIM No. 418 protects criminal defendants by instructing the jury *not* to consider statements made by coconspirators unless the People have proven, by a preponderance of the evidence, that there was a conspiracy, the declarant was a member of the conspiracy, the declarant made the statement to further the goal of the conspiracy, and the statement was made before or during the time the defendant was participating in the conspiracy.

Appellants' argument is based on a misreading of the instruction. The first paragraph of CALCRIM No. 418 clearly informed the jurors that they could not consider any

---

19      Evidence Code section 1223 states, "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

coconspirator's out-of-court statements in deciding the conspiracy charges unless the People proved by a preponderance of the evidence four requirements for considering the out-of-court statements. CALCRIM No. 418 did not instruct the jurors regarding what they needed to find to convict appellants of conspiracy. On this issue, the court instructed with CALCRIM No. 563 which provided that the People would have to prove four elements, the existence of an agreement, the necessary intent to agree and kill, and the commission of an overt act. In turn, CALCRIM No. 220 expressly told the jury, "Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise." CALCRIM No. 418 is not confusing and, when considered with the other instructions provided to the jury, did not reduce the prosecution's burden of proof. Accordingly, we reject appellants' claim of instructional error.

B. *Multiple Conspiracies*

The jury found Ware guilty of conspiracy to murder suspected NC and WCC gang members (count 1). It also found him guilty of attempted murder based on the March 25, 2014 shooting (count 10) where he drove his car into WCC territory and his passenger shot at a WCC gang member. To the extent the conspiracy had an objective apart from the attempted murder in count 10, Ware submits that the crimes committed in furtherance of the conspiracy reveal not a single overarching conspiracy but many different conspiracies. Citing *People v. Jasso* (2006) 142 Cal.App.4th 1213, 1220 (*Jasso*), Ware asserts that the question whether there were multiple conspiracies, or a single conspiracy, was an issue of fact for the jury to decide if evidence existed to support alternative findings. He claims that

because there were multiple conspiracies, the trial court erred in failing to sua sponte instruct the jury that it could find the existence of multiple conspiracies.

The People contend that Ware forfeited the purported error by failing ask the court to amplify the instructions provided. Assuming we determine the claim is cognizable, the People argue that there is a split of authority whether the existence of a single conspiracy, as opposed to multiple conspiracies, is one of law for the trial court or one of fact for the jury. Even assuming the question is one for the jury to decide, the People assert that a sua sponte duty to instruct on multiple conspiracies exists only when there is evidence to support alternative findings and the facts here support only one conspiracy.

In addressing whether a trial court has a sua sponte duty to instruct the jury to determine the number of conspiracies committed, another panel of this court noted that trial courts are required to give correct jury instructions on the general principles of law relevant to issues raised by the evidence, with or without a request. (*People v. Kopp* (2019) 38 Cal.App.5th 47, 84, review granted Nov. 13, 2019, S257844 (*Kopp*)[20].) Accordingly, we decline to find the claim forfeited and turn to the issue whether the existence of a single conspiracy, as opposed to multiple conspiracies, is one of law for the trial court or one of fact for the jury. On this issue, we follow *Kopp* and conclude "that the number of conspiracies is a question of fact" and that a trial court has a duty "to instruct the jury, sua sponte, to

---

[20]    The Supreme Court has limited review in *Kopp*, *supra*, 38 Cal.App.5th 47 to the following questions:  "(1) Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments? (2) If so, which party bears the burden of proof regarding the defendant's inability to pay?"  We may cite *Kopp* for its persuasive value while review is pending.  (Cal. Rules of Court, rule 8.1115(e)(1).)

determine the number of conspiracies 'where the evidence supports alternative findings.' " (*Id.* at p. 85.)

For purposes of analysis, we will assume, without deciding, that the evidence supported alternative findings regarding the existence of a single, or multiple conspiracies. However, we conclude that because the People charged a single conspiracy, Ware suffered no prejudice in the court's failure to instruct the jury to determine if there were multiple conspiracies.[21]  As another court explained, "we fail to see how charging defendant with one count of conspiracy, instead of multiple counts, could prejudice defendant.  Any error would therefore be harmless.  [¶]  Furthermore, assuming there were multiple conspiracies, we do not see how the existence of the uncharged conspiracies can result in the reversal of a guilty finding in the one conspiracy that was charged.  If the evidence submitted to the jury supports the guilty finding on the charged conspiracy, the fact that the same evidence might also have supported other conspiracies, which were not charged, is of no consequence to the issue of innocence or guilt on the charged conspiracy."  (*People v. Vargas* (2001) 91 Cal.App.4th 506, 553.)  We agree with this assessment and conclude that any assumed error was harmless.

---

[21]     The cases Ware cites to show prejudicial error involved situations where the defendant was convicted of *multiple* conspiracies and the issue presented was whether the trial court erred in not instructing the jury on whether a single conspiracy existed.   (See *People v. Meneses* (2008) 165 Cal.App.4th 1648, 1651, 1671; *Jasso*, *supra*, 142 Cal.App.4th at p. 1215; *Kopp*, *supra*, 38 Cal.App.5th at pp. 55, 88.)

# III.

## *WARE'S ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS*

A. *General Legal Principles*

A defendant seeking reversal for ineffective assistance of counsel must prove both deficient performance and prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) To demonstrate prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Id.* at pp. 694-695.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.) "The likelihood of a different result must be substantial, not just conceivable." (*Harrington v. Richter* (2011) 562 U.S. 86, 112.)

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Where counsel's trial tactics "for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

B. *Pat Down Search on January 29, 2014*

    1. Additional Background

On this date, a gang suppression team officer observed Ware and another African-American male walking down the street in an area claimed by the Lincoln Park gang. The officer, who had never seen or contacted Ware before, noticed that Ware wore a black hat with a white "W" on it, leading him to suspect that Ware might be affiliated with WCC, a Lincoln Park rival. The officer stopped the men and let Ware's companion leave after determining that this individual was not involved in gang activity. The officer handcuffed Ware and searched him, despite Ware stating that he did not want to be searched. During the search, the officer found a loaded gun.

At trial, the parties stipulated that on the date of this incident Ware had a prior felony conviction. In count 8, the jury convicted Ware of being a felon in unlawful possession of a firearm based on the discovery of the gun during this stop and frisk.

Before this matter was assigned for trial, Ware requested at least three *Marsden*[22] hearings "maybe more." After being assigned for trial, Ware requested three *Marsden* hearings. At the first hearing, Ware complained about the following: (1) pressure to accept a 20-year plea agreement; (2) violations of the Fourteenth and Eighth Amendments; (3) excessive bail; (4) failure to visit; and (5) failure to provide discovery. After hearing from defense counsel, the court denied the motion.

---

[22]     *People v. Marsden* (1970) 2 Cal.3d 118.

64

At the second hearing, Ware raised several issues, including that he wanted counsel to challenge "a gang-enhancement issue that had illegal search-and-seizure issues." After hearing Ware's other complaints, the court commented "we've had one attorney in this matter file various motions, none of which have had any merit. So attorneys shouldn't file motions that don't have merit, right. You need to fight where you can fight and concede where you need to concede. It's like a—like a smart football game, all right. Sometimes you don't want the guy to get a touchdown, but you don't care if he gets five yards, so you concede the five yards. Play smart, all right. I mean, that's the way I look at it. And [your defense counsel is] a good tactician that way. He's been around a long time."

At a third pretrial *Marsden* hearing, Ware complained about certain motions he wanted filed, a lack of communication, and withholding exculpatory evidence. After hearing from defense counsel, the court denied the motion, committing that Ware had "a very good attorney" representing him.

During a posttrial proceeding regarding Ware's prior convictions, Ware requested another *Marsden* hearing. At this hearing, Ware argued, among other things, that counsel improperly admitted his guilt on this possession charge because the officer illegally obtained the gun during the search and that the gun was "fruit from a poisonous tree." Defense counsel responded that he conceded guilt on the possession charges for tactical reasons, stating this was "a tactical decision that someone could second-guess." Counsel also noted that he did not file "a search and seizure motion" because he did not "believe such a motion was there . . . based on the nature of the search and the circumstances

surrounding it." At the end of the hearing, defense counsel stated that he and Ware had disagreements about certain legal issues, he believed the issues raised were all "tactical decisions that [he] made consciously and intentionally based on the state of the facts and the state of the law."

At a second posttrial *Marsden* hearing, Ware indicated his desire to request a new trial to argue, among other things, ineffective assistance of counsel. The court continued the matter to conduct its own research. At the subsequent hearing, the court concluded that Ware lacked grounds for the appointment of counsel to review the record for the possible filing of a new trial motion based on ineffective assistance of counsel.

2. Analysis

Ware concedes that defense counsel thoroughly cross-examined the detaining officer at trial regarding the reason for stopping and searching him. He contends, however, that defense counsel provided constitutionally ineffective assistance by failing to file a suppression motion because the stop and search violated his Fourth Amendment right to be free from unlawful searches and seizures.[23] Ware submits that the record on appeal is sufficiently complete to reveal there could be no rational basis for failing to challenge the detention and search. Specifically, he claims that defense counsel addressed his reason for not filing a suppression motion at the *Marsden* hearing, but failed to provide a meaningful response. The People disagree, arguing that Ware failed to

---

[23] Simpson joins in this argument claiming that the failure to move to exclude the gun as evidence allowed inadmissible evidence to be admitted to prove his conviction of count one which denied him due process of law and constituted a miscarriage of justice.

66

rebut the presumption that defense counsel rendered reasonable professional assistance and cannot show that a motion to suppress the firearm would have been successful.

Ware has the burden of establishing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Strickland*, *supra*, 466 U.S. at p. 687.) Ware admits that it is "particularly challenging" to show ineffective assistance on direct appeal. Ware is correct. This standard is "highly demanding" and requires that a defendant prove "gross incompetence." (*Kimmelman v. Morrison* (1986) 477 U.S. 365, 382.) "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Strickland* at p. 689.)

In *People v. Mendoza Tello* (1997) 15 Cal.4th 264, the Supreme Court unanimously reversed the Court of Appeal's reversal of the defendant's conviction on the grounds that counsel was ineffective for failing to file a suppression motion; the court did so due to gaps in the record: "On this record, we do not know what [the deputy] would have said had he been asked at a suppression hearing why he did what he did. . . . [P]erhaps he did have a reason, of which defense counsel was aware, and which justified counsel's actions. Perhaps there was some other reason not to suppress the evidence." (*Id.* at p. 267.) "No one gave [the deputy] the opportunity to point to any specific and articulable facts justifying his actions. Nor did the prosecution have the opportunity to offer some other possible reason not to suppress the evidence." (*Ibid.*)

67

We decline to resolve Ware's ineffectiveness of counsel claim because the record does not "affirmatively disclose[]" that Ware's counsel had no rational tactical purpose for his allege omission. (*People v. Fosselman* (1983) 33 Cal.3d 572, 581.) Here, the record suggests that counsel made a tactical decision to not to file a suppression motion based on "the nature of the search and the circumstances surrounding it." Accordingly, we reject this ineffective assistance claim "without prejudice to any rights [Ware] may have to relief by way of a petition for writ of habeas corpus." (*People v. Garrido* (2005) 127 Cal.App.4th 359, 367.)

C. *Concession of Guilt Firearm Possession (Counts 8, 12, 13)*

1. Additional Background

During opening statement, defense counsel conceded Ware's guilt for unlawfully possessing the firearms as alleged in counts 8, 12, and 13 (collectively the possession charges). Counsel instead focused on why the evidence would not establish the other counts against his client. At closing argument, defense counsel again addressed the possession charges, stating:

> "Let's turn to Count 12 and 13, possession of the firearms. I told you in opening statements. I'll tell you again. I'm not going to stand up here and argue that because they were locked in his sister's bedroom that they were not his at least constructively. Mr. Ware is guilty of those counts. Those firearms were found in his house.
>
> "All of the banter about, well, he didn't come out fast enough. He didn't do all those things. Doesn't really matter. He's responsible for those firearms. His sister was not packing guns in her bedroom.

"But on April 23, 2014, . . . two weapons were found . . . There are some important facts to remember about these weapons. Neither of these guns was used in any of the 18 shootings presented in this case.

"Ware's prints and DNA were not even on the gun from the 1-29-14 burglary that was found. No prints or DNA from any other person were found on these guns, especially no one from the specific conspiracy group that we are here to talk about.

"Turning to Count 8. January 29, 2014. Another news flash. He's guilty. He was carrying that weapon when he was stopped on the street. Don't need to argue about why he was stopped. I would point out he wasn't with anyone from this group. And, again, the same points. That gun was not involved in any of the 18 shootings. There was no DNA or prints from any other person found on that gun."

When addressing the lack of evidence tying Ware to the charged conspiracy, defense counsel acknowledged the two occasions that Ware illegally possessed firearms and concentrated on the lack of evidence against Ware on the conspiracy charge.

2. Analysis

Ware asserts defense counsel provided constitutionally deficient assistance during opening and closing arguments by admitting the possession charges. He claims that he had viable defenses to the possession charges; namely, grounds existed to suppress the gun found during the January 2014 pat down search and the evidence did not show he constructively possessed the two guns found in his sister's bedroom.[24] The People argue that defense counsel made a reasonable tactical decision to concede Ware's guilt on the

---

[24]    Simpson joins in Ware's argument claiming that the concession of the firearm possession counts allowed inadmissible or defensible evidence to be admitted to prove his conviction of count 1.

69

possession charges. Further, the People assert that Ware failed to demonstrate a reasonable probability that, but for counsel's alleged error, the result of the proceedings would have been different.

"[A] defense attorney's concession of his client's guilt, lacking any reasonable tactical reason to do so, can constitute ineffectiveness of counsel." (*People v. Gurule* (2002) 28 Cal.4th 557, 611.) However, defense counsel cannot be faulted for adopting "a more realistic approach" based on the evidence. (*Id.* at p. 612.) Partial concessions of culpability are a legitimate tactical choice by defense counsel where the incriminating evidence is strong. (See, e.g., *People v. Hart* (1999) 20 Cal.4th 546, 631; *People v. Bolin* (1998) 18 Cal.4th 297, 334-335.)

Here, Ware undisputedly had a firearm on his person during the January 2014 pat down search (count 8)[25] and possessed the Hi-Point firearm (count 13) found in his sister's bedroom at one point because it contained his DNA. Defense counsel's concession on counts 8 and 13 simply reflected the reality of the evidence, and the recognition that to argue Ware did not possess these firearms would likely damage counsel's credibility with the jury. Thus, it was a reasonable tactical decision. (*Gurule*, *supra*, 28 Cal.4th at p. 612.) For the same reasons, Ware cannot show prejudice from defense counsel's tactical decision on these counts, because it is not reasonably probable

---

25    The question whether defense counsel provided ineffective assistance by failing to move to suppress this gun cannot be resolved on this record. (See, *ante*, pt. II.B.2.)

70

that in the absence of counsel's concession, he would have received a better verdict. (See *Strickland*, *supra*, 466 U.S. at pp. 693-696.)

Regarding the Ruger firearm also found in Ware's sister's bedroom (count 12), defense counsel similarly had a tactical reason for conceding Ware's guilt. Namely, the evidence suggested Ware placed both guns in his sister's bedroom to thwart the officers during the pending search. (*Ante*, pt. I.F.2.) Again, to argue otherwise, would likely damage counsel's credibility with the jury. On the record before us, we cannot conclude that defense counsel had no rational tactical purpose for making the concession he did regarding count 12.

Finally, for the first time in his reply brief, Ware cites *McCoy v. Louisiana* (2018) ___U.S.___, 138 S.Ct. 1500 (*McCoy*) to assert that defense counsel's concessions violated the Sixth Amendment and constitute a structural error warranting a new trial. Presumably, Ware tendered this new argument in his reply brief because the Attorney General argued in his respondent's brief that *McCoy* did not apply.

"The primary purpose of a reply brief is to *rebut* points made in respondent's brief—i.e., to discuss matters raised by respondent that were not adequately addressed in appellant's opening brief." (Eisenberg et al., Cal. Practice Guide: Civil Appeals & Writs (The Rutter Group 2019), § 9.76, p. 9-26.) Ware's backward approach is contrary to our well-established rules of appellate litigation. "It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party." (*People v. Tully* (2012) 54 Cal.4th 952, 1075.) " '[T]he rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for

71

failure to present them before.' " (*People v. Smithey* (1999) 20 Cal.4th 936, 1017, fn. 26.) Ware failed to make such a showing and we can deem this argument forfeited. In any event, to avoid a claim of ineffective assistance regarding appellate counsel, we exercise our discretion to consider and reject Ware's argument on the merits. (See *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.)

In *McCoy*, defense counsel informed defendant two weeks before trial that he intended to concede defendant's guilt of a triple homicide. (*McCoy*, *supra*, ___U.S. ___, 138 S.Ct. at p. 1506.) Defendant was " 'furious ' " insisting he was innocent and had been out of state when the murders occurred. (*Ibid.*) Two days before trial, the court denied defendant's request to terminate his counsel's representation based on counsel's intent to concede guilt. (*Ibid.*) During counsel's opening statement, out of earshot of the jury, defendant again informed the court he disagreed with counsel's concession of guilt. (*Id.* at p. 1507.) Nevertheless, defense counsel told the jury it was " 'unambiguous' " that " 'my client committed three murders.' " (*Ibid.*)

The Supreme Court reversed the conviction, holding that, "[A] defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty. . . . [I]t is the defendant's prerogative, not counsel's, to decide on the objective of his defense . . . ." (*McCoy*, *supra*, ___U.S. ___, 138 S.Ct. at p. 1505.) The Court stated that defense counsel provides assistance, but some decisions are reserved to the client, including whether "the objective of the defense is to assert innocence . . . ." (*Id.* at p. 1508.)

Having reviewed *McCoy*, *supra*, ___U.S. ___, 138 S.Ct. 1500 and its progeny, we find no Sixth Amendment violation because the record in the *Marsden* hearings make clear that Ware disagreed with defense counsel's *tactical* decision to concede guilt on the possession charges. Ware never objected to the concession claiming factual innocence.

As noted in *McCoy*, " '[n]o blanket rule demand[s] the defendant's explicit consent' to implementation of that strategy [of concession]." (*McCoy*, *supra*, ___U.S. ___, 138 S.Ct. at p. 1505.) Rather, *McCoy* makes clear that for a Sixth Amendment violation to exist, a defendant must make his intention to maintain innocence clear to his counsel, and counsel must override that objective by conceding guilt. (*Id.* at p. 1509 ["When a client expressly asserts that the objective of *'his* defence' *is to maintain innocence* of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt" [second italics added].) Here, nothing in the record demonstrates Ware's unambiguous intent to maintain his factual innocence of the possession charges. Rather, the record shows that Ware had a gun on his person during the January 2014 stop and that one of the guns found during the April 2014 search contained his DNA. The issue was not one of innocence, but of how to best defend Ware against these charges and the third possession charge. No violation of Ware's constitutional right to counsel occurred.

Ware's reliance on *People v. Eddy* (2019) 33 Cal.App.5th 472 (*Eddy*) is misplaced. During a posttrial *Marsden* hearing, defense counsel in *Eddy* admitted knowing defendant's desire to claim innocence as his defense, but as a tactical decision, explained he would concede guilt on the lesser offense at closing argument. (*Id.* at p. 478.) Defendant told the trial court that he advised counsel "not to go that route, and he had

done it anyway." (*Id.* at pp. 478-479.) The appellate court, consistent with *McCoy*, *supra*, ___U.S. ___, 138 S.Ct. at p. 1505, "conclude[d] that defendant has established a violation of his right to decide the objective of his defense under *McCoy*, and because this violation constitutes structural error," reversed the murder conviction. (*Eddy*, at p. 483.)

Thus, in *Eddy*, "the record establishe[d] that defendant instructed his counsel to maintain his innocence before the closing argument and that this instruction was not honored." (*Eddy*, *supra*, 33 Cal.App.5th at p.482.) Here, however, Ware *never* argued that he was factually innocent of the possession charges. Accordingly, *Eddy* is not controlling. (Accord, *People v. Flores* (2019) 34 Cal.App.5th 270, 280 ["Flores's objective at both trials was express and unambiguous: to maintain his innocence of the acts alleged as the actus reus of the charged crimes—i.e., driving the car and possessing the weapons—irrespective of the weight of the evidence against him."].)

IV.

*HOSKINS'S MISTRIAL AND FARETTA MOTIONS*

A. *Additional Background*

On April 13, 2016, approximately one month after trial began, Hoskins's defense counsel had a medical emergency in the courtroom and was transported to the hospital. The court recessed the trial until the following Monday, April 18. At a hearing on that date, the court recessed the matter until the following Monday, April 25. At a hearing on April 25, Hoskins's defense counsel asked to withdraw from the case for medical reasons, indicating that he needed to focus on his health for several months.

74

The court stated that if it relieved Hoskins's defense counsel it would appoint new counsel for Hoskins and declare a mistrial as to Hoskins. After making this statement, Simpson and Ware moved for a mistrial. The court relieved Hoskins's defense counsel. New counsel appeared for Hoskins stating he could accept the appointment, but that it would take him up to a year or more to be ready for trial. At that point, Hoskins asked if the court "could set aside that mistrial if I choose to represent myself." After additional discussion with the court, Hoskins formally asked for the right to represent himself and to set aside the mistrial.

The court had a conversation with Hoskins, concerned that Hoskins was asking to represent himself "out of duress and a sense of urgency, desperation because you're tired of being locked up and not knowing what your future holds." The court told Hoskins that "at this point in time I'm prepared to declare a mistrial and appoint a new attorney to represent you" unless Hoskins could demonstrate that he was ready to represent himself. The court took a recess and resumed with just the People and Hoskins present.

The People asked for clarification whether the court had declared a mistrial as to Hoskins. The court responded that it needed to "comb through the record to probably answer that definitively" but that it "believe[d] [it] did declare a mistrial this morning. . . ." The court stated that it was not inclined to allow Hoskins to represent himself, believing that Hoskins might be trying to create an appealable issue should he be convicted while self-represented. The court recessed the matter to allow the parties to research whether jeopardy attached if the court did not permit Hoskins to represent himself.

The following day, all parties appeared to address Hoskins's request to represent himself. Citing *People v. Dent* (2003) 30 Cal.4th 213 (*Dent*), the People argued that the court must honor Hoskins's right to self-representation unless the request was not voluntary or untimely. The People asserted that the request was timely under the circumstances and not coerced. The court had Hoskins fill out an acknowledgement regarding self-representation and a waiver of right to counsel form. The court reviewed these documents with Hoskins and granted Hoskins's request to represent himself. Thereafter, the court denied Simpson's mistrial motion.

After Hoskins's conviction, the court appointed Hoskins counsel, who filed a motion for new trial. The court denied the new trial motion.

B. *Analysis*

Hoskins argues that legal necessity required a mistrial, the court properly granted a mistrial, but erred when it later reversed its mistrial order based solely on the unfounded concern that if a mistrial was ordered, double jeopardy would bar a retrial. Accordingly, he asserts that the court failed to make an informed decision on the existence of legal necessity for a mistrial and the error constituted an abuse of discretion requiring a reversal of the judgment. He also claims that the court's failure to declare a mistrial violated his right to counsel, right to a fair trial, and constituted structural error because his right to effective legal representation was violated. He complains that the court compounded the error by granted his request for self-representation based solely on the above mistakes of law and despite finding that his request for self-representation was not voluntary, timely or unequivocal.

76

The People disagree, claiming that the court never actually granted Hoskins a mistrial, but even if it had, it properly rescinded that order because Hoskins's objection to a mistrial and assertion of his constitutional right to represent himself negated the legal necessity for a mistrial. The People argue that granting a mistrial without Hoskins's consent and without legal necessity would have prevented a retrial and that Hoskins cannot complain because he decided to represent himself and remove the legal necessity required for the court to grant a mistrial. The People further assert that the court properly granted Hoskins's *Faretta* motion, but even assuming error, the assumed error was invited or harmless. As we shall explain, the court never granted Hoskins a mistrial and the proper grant of Hoskins's *Faretta* motion eliminated the need to declare a mistrial.

1. The court never granted Hoskins a mistrial

The United States and California constitutions prohibit the government from putting a person in jeopardy twice for the same offense. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15; see Pen. Code, § 1023.) If a trial court discharges a sworn jury without a verdict, double jeopardy principles prohibit retrial of the defendant unless the defendant consented to the discharge or legal necessity justified it. (*People v. Batts* (2003) 30 Cal.4th 660, 679; *Larios v. Superior Court of Ventura County* (1979) 24 Cal.3d 324, 329.)

Legal necessity for declaring a mistrial and discharging the jury without a defendant's consent typically arises "where the jury is unable to agree on a verdict" or "where physical causes beyond the control of the court, such as the death, illness or absence of a judge, juror, or the defendant, make it impossible to continue." (*People v. Brandon* (1995) 40 Cal.App.4th 1172, 1175.) This list is not exclusive. (*In re Carlos V.* (1997) 57 Cal.App.4th

77

522, 527.)  Legal necessity for granting a mistrial without the defendant's consent may also exist where the trial court is required to replace defense counsel in the middle of trial. (*People v. Manson* (1976) 61 Cal.App.3d 102, 202 (*Manson*).)  Legal necessity for granting a mistrial without the defendant's consent was also found to exist where counsel belatedly discovers a conflict of interest.  (*People v. McNally* (1980) 107 Cal.App.3d 387, 391.)

The State bears a heavy burden in justifying a mistrial over defendant's objection. (*Arizona v. Washington* (1978) 434 U.S. 497, 505.)  "A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged" applying the deferential abuse of discretion standard.  (*People v. Bolden* (2002) 29 Cal.4th 515, 555.) Under this standard, we will not reverse " 'unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' "  (*People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094.)

The first question before us is whether the trial court granted Hoskins a mistrial.  A careful review of the record shows that it did not.  Defense counsel stated that he needed to withdraw due to health reasons and was uncertain whether he would be able to resume his representation even after a month's delay.  The trial court responded that if it relieved counsel "we would have to declare a mistrial" as to Hoskins and appoint counsel for Hoskins.  Thereafter, Simpson moved for a mistrial "based on the fact that a mistrial has been declared as to Mr. Hoskins."  After hearing from the parties on whether a mistrial was appropriate for Simpson and Ware, the court relieved Hoskins's counsel and recessed the matter to obtain replacement counsel and "try to set new dates" for Hoskins.

When Hoskins's replacement counsel arrived, he accepted the appointment, but stated that it might take him more than a year to get ready for trial. Hoskins then addressed the court stating, "I understand you already—you ordered a mistrial on this case. I'm just asking if—is there a possible way that you could set aside that mistrial if I choose to represent myself and finish the rest of this—the remainder of the trial?" After Hoskins clarified that he was "asking for the right to represent [him]self for the remainder of the trial," the court stated, "If you want to represent yourself, that's something you can think about, Mr. Hoskins, but at this point in time I'm prepared to declare a mistrial and appoint a new attorney to represent you." The court then heard from the prosecutor whether legal necessity existed to declare a mistrial and whether the court had actually granted a mistrial. The court replied:

> "Well, we'll have to go back and comb through the record to probably answer that definitively. But, yeah, I believe the Court did declare a mistrial this morning because I inquired of anyone if they had an objection before doing, . . . But notwithstanding that, if in fact there's an opportunity for the Court to consider his request to go pro per, I don't want to suggest that I will close the door on him without giving consideration to that."

The clerk's minute order states that at 3:24 p.m. on April 25, 2016, the trial court declared a mistrial as to Hoskins. Our review of the reporter's transcript, however, shows that the court did not grant Hoskins a mistrial. The following day, the court allowed Hoskins to represent himself. "Conflicts between the reporter's and clerk's transcripts are generally presumed to be clerical in nature and are resolved in favor of the reporter's transcript unless the particular circumstances dictate otherwise." (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 249.) Here, an irreconcilable conflict appears in the record. The circumstances,

79

however, do not persuade us to depart from the usual presumption that the reporter's transcript prevails.

Because the court did not grant a Hoskins a mistrial, the question becomes whether the trial court erred by not sua sponte granting a mistrial. As the People concede, the sudden illness of defense counsel during trial and the inability of replacement counsel to try the matter without undue delay created legal necessity to grant a mistrial. (See *Manson*, *supra*, 61 Cal.App.3d at p. 202 [disappearance of defense counsel midtrial justified mistrial that did not bar retrial]; accord, *State v. Anderson* (2010) 295 Conn. 1, 3 [mistrial proper when prosecutor suddenly became seriously ill and unable to continue]; *State v. Melton* (Wash. Ct. App. 1999) 97 Wash.App. 327, 330, 333-334 [absence of defense counsel due to illness created manifest necessity for grant of mistrial, so that retrial was not barred by double jeopardy clause]; *Westover v. State* (1947) 66 Ariz. 145, 149 [jeopardy does not attach following mistrial due to judge's illness].) The granting of a mistrial under these circumstances would not have barred a retrial. (*Ibid.*)

Significantly, the record shows the court understood that defense counsel's illness constituted legal necessity to grant a mistrial and that double jeopardy would not bar a retrial should it grant Hoskins a mistrial. Accordingly, we reject Hoskins's argument that the court abused its discretion by failing to make an informed decision on the existence of legal necessity for a mistrial. As we explain *post*, the trial court did not err by failing to sua sponte grant a mistrial because the grant of Hoskins's *Faretta* motion eliminated the need for a mistrial.

2. The grant of Hoskins's *Faretta* motion eliminated the need for a mistrial

      a. Additional Background

After asking to represent himself for the remainder of trial, Hoskins stated that he represented himself at the preliminary hearing, he was a grown man, "And I feel like it's my decision. I know the consequences and I know benefits. I'm willing to take that gamble, and I feel like it should be up to me. I'm not under duress. I'm very competent." When the court asked Hoskins why he did not continue his self-representation, the following dialog took place:

> "DEFENDANT HOSKINS: Because I feel like [defense counsel] is better qualified. But during the—I been paying attention since trial been going through, and I have seen that it's not what I thought it was. And the evidence isn't what they say it is to be. I feel like the case is self-explanatory. I feel like if I'm guilty, the jury is going to say I'm guilty regardless of the fact if I have [defense counsel] or not.
>
> "That's the burden the prosecution is trying to prove. Doesn't matter with defense counsel. I feel like I can finish this trial. It will be easier now that we're—done a majority of it, and [defense counsel] done all the hard work. It's the end. We're down to the closing and I feel like I can do that.
>
> "THE COURT: I don't think we're down to the closing, Mr. Hoskins. Quite frankly, there are more witnesses to go through in the case.
>
> "DEFENDANT HOSKINS: Once again, Your Honor, the witnesses don't necessarily apply to me. And, like, we haven't been questioning every single witness.
>
> "THE COURT: Well, do you know what witnesses are left to be called, sir?
>
> "DEFENDANT HOSKINS: That apply to me, I believe only—for the prosecution's case, [the gang expert]. My defense, I

81

plan on calling some more witnesses.  I have questions that I would like to ask them."

The court recessed the matter to review Hoskins's file.  When back on the record, the court stated:

> "Mr. Hoskins, I want to make sure the record's very clear. Your request to represent yourself under normal circumstances would be considered to be untimely because we are in the latter part of the trial itself.  So if you had asked to represent yourself without [defense counsel] having taken ill, it would have been an easy answer for the Court.  Would have been no because it would have been untimely.  Would not have been any basis for the delay, no reasonable justification for the late request.
>
> "I don't think your request is unreasonable given what has happened, and I don't think that you have done anything to try to obstruct or interfere with these proceedings in this case. . . ."

The following day, the prosecutor expressed his belief that it was "unwise" for Hoskins to represent himself, but questioning whether the court could legally deny the request.  The court stated it was not prepared to say that Hoskins's request was timely, but declined to fault Hoskins, finding that Hoskins was not trying to interfere with the proceedings.  The court also stated:

> "On the other hand, the Court does not find that it can reach a conclusion that Mr. Hoskins' request to represent himself is voluntary.  And I do believe it is derived out of frustration, not necessarily anger but just frustration given the delay that he's faced previously, given the circumstance that he finds himself in today without counsel, and trying to move this matter forward so that he's no longer incarcerated, in his mind, unnecessarily.
>
> "To suggest that that is a voluntary choice really is, from the Court's perspective, choosing the least of very poor choices that are before him.

"So to the extent that he's prepared to represent himself, yes, I think it is knowing. I think that it is unwise, but that is not the criteria for the Court. No matter how unwise it is, this Court is aware of its authority to not interfere with the constitutional right, and it is a constitutional right to represent oneself.

"So to that extent, it's very difficult for the Court to come up with any reasons to interfere with that exercise of that right, if that's in fact what Mr. Hoskins wants to do.

"I think for this Court it's unprecedented that it's happened in the way that it's happened. I'm satisfied that Mr. Ramirez' health— he's gravely ill. It poses for the Court a legal necessity to remove him and to grant him to withdraw from the case. I think that legal necessity is a basis that jeopardy is not an issue, that jeopardy does not attach when there's a legal necessity for the Court to declare a mistrial.

"On the other hand, if it is Mr. Hoskins' continued desire to represent himself and the People are concerned the Court may be in error, the Court finds that there's protections in place that if it allows Mr. Hoskins to represent himself and he gets convicted and he should not have had to make that choice given the circumstances, that the appellate courts can certainly give him another day in court, whether it be to represent himself or to be appointed to counsel.

"Quite frankly, it may be having two bites of an apple. But be that as it may, it is not this Court's intention to delay Mr. Hoskins' right to have a speedy trial. But I am reluctant to have him have to represent himself under the circumstances which he finds himself because I do not believe that but for Mr. Ramirez' illness that he would have chosen to represent himself. . . .

"So having said that, I'm not convinced that under analysis of the law that I'm prepared to embrace that it is completely voluntary on his behalf.

"But if it is your desire to continue to represent yourself, Mr. Hoskins, I'm going to have you go ahead and go through this form, read it, initial it, and then I'll go over it with you, and we'll go from there."

The court reviewed the 23 paragraphs of the waiver of the right to self-representation form with Hoskins, and Hoskins confirmed his understanding of each paragraph.  The trial court then told Hoskins it was prepared to sign the form, and once signed, Hoskins would be self-represented.  The court asked Hoskins one last time, given everything they had discussed, whether he still insisted on representing himself.  Hoskins said yes.  The trial court then granted Hoskins's request to represent himself.  Thereafter, the court ordered a runner for Hoskins, made sure that Hoskins received his prior counsel's notes and the discovery pertinent to the social media evidence.

### b.  Analysis

A criminal defendant has a federal constitutional right to self-representation at trial. (*Faretta*, *supra*, 422 U.S. at p. 807.)  A trial court must grant a defendant's request for self-representation if the defendant is mentally competent, unequivocally asserts that right within a reasonable time prior to the commencement of trial, and makes his request voluntarily, knowingly, and intelligently after being apprised of the dangers of self-representation. (*People v. Welch* (1999) 20 Cal.4th 701, 729 (*Welch*).)  "The right of self-representation is absolute, but only if a request to do so is knowingly and voluntarily made and if asserted a reasonable time before trial begins.  Otherwise, requests for self-representation are addressed to the trial court's sound discretion.  [Citation.]  Moreover, whether timely or untimely, a request for self-representation must be unequivocal."  (*People v. Doolin* (2009) 45 Cal.4th 390, 453.)  " '[A] motion made out of a temporary whim, or out of annoyance or frustration, is not unequivocal—even if the defendant has said he or she seeks self-representation.' " (*People v. Danks* (2004) 32 Cal.4th 269, 295.)

84

When ruling on a *Faretta* motion, "[t]he relevant inquiry is narrow.  The trial court is not concerned with the wisdom of defendant's decision [regarding self-representation], or with how well he [or she] can do so.  The sole relevant question is whether the defendant has the mental capacity to knowingly waive counsel while realizing the probable risks and consequences of self-representation.  [Citations.]  The court has discretion to determine the defendant's competence to waive counsel; its ruling will not be disturbed on appeal absent an abuse of that discretion."  (*People v. Clark* (1992) 3 Cal.4th 41, 107.)

It is undisputed that Hoskins was mentally competent and that he knowingly, and intelligently requested self-representation after being apprised of its dangers.  (*Welch*, *supra*, 20 Cal.4th at p. 729.)  Hoskins asserts that the court's comments regarding his motivation for requesting self-representation amounted to a finding that his request was not voluntary.  On the issue whether Hoskins's request was voluntary, the court never expressly found Hoskins's request to be involuntary.  Instead, when reviewed in context, the court's comments reflected its opinion that avoiding further delay was not a good reason for self-representation, but that Hoskins was "choosing the least of the very poor choices that are before him."

Significantly, Hoskins does not argue that his request for self-representation was involuntary in the sense that it was coerced or the result of duress.  Rather, Hoskins stated that he was "not under duress" and "very competent."  We conclude that Hoskins's selection of self-representation, over the delay necessitated by a mistrial and retrial with new counsel, did not render his choice involuntary.  (See *State v. Arguelles* (Utah 2003) 63 P.3d 731, 751 [requiring a defendant to choose between competent appointed counsel and proceeding pro se does not amount to an involuntary decision]; *McKee v. Harris* (2nd Cir. 1981) 649 F.2d

927, 931 [a court may, under certain circumstances, require the defendant to select from a limited set of options a course of conduct regarding his representation].) Accordingly, we reject Hoskins's argument that the trial court erred in granting the *Faretta* motion on the ground Hoskins's decision was involuntary.

Hoskins next claims that the court erred in granted his *Faretta* motion because it was untimely. We disagree.

Our high court has observed "that our imposition of a timeliness 'requirement should not be and, indeed, must not be used as a means of limiting a defendant's *constitutional* right of self-representation.' [Citation.] Rather, the purpose of the requirement is 'to prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice.' " (*People v. Lynch* (2010) 50 Cal.4th 693, 722, overruled on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 637.) "[T]imeliness for purposes of *Faretta* is based not on a fixed and arbitrary point in time, but upon consideration of the totality of the circumstances that exist in the case at the time the self-representation motion is made." (*Lynch*, at p. 724.) Where, as here, "a motion for self-representation is not made in a timely fashion prior to trial, self-representation no longer is a matter of right but is subject to the trial court's discretion." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1365.)

Hoskins sought to represent himself shortly after the court indicated it would need to declare a mistrial and appoint Hoskins new counsel. Under the circumstances presented, Hoskins's request was undoubtedly timely. Additionally, in addressing the timing of the request, the court expressly found the motion not "unreasonable given what has happened,

and I don't think that [Hoskins has] done anything to try to obstruct or interfere with these proceedings in this case." On this record, we reject Hoskins's argument that the trial court should have denied his request as untimely.

Finally, Hoskins suggests the court erred in granting the *Faretta* motion because it never found that his request was unequivocal. "In determining on appeal whether the defendant invoked the right to self-representation, we examine the entire record de novo." (*Dent*, *supra*, 30 Cal.4th at p. 218.) Although the trial court never expressly found that Hoskins's request for self-representation was unequivocal, its act of granting the request shows it made an implied finding. The record supports this implied finding. (*People v. Tena* (2007) 156 Cal.App.4th 598, 607 [the failure to make express findings does not obligate reviewing court to conclude that appellant's *Faretta* rights were infringed].)

After his counsel withdrew, and after listening to discussion regarding how the trial would proceed, Hoskins initially inquired whether he could proceed in pro per. After additional discussion of the situation, Hoskins clearly and unequivocally asked for the right to represent himself for the remainder of trial. After more discussion, the court recessed the matter for the evening to allow the parties to research the matter. The following morning, the court stated that Hoskins had the night to think about his request and confirmed that Hoskins wished to represent himself for the remainder of the trial.

In summary, the record does not suggest that Hoskins's request to represent himself was legally insufficient. Rather, the record demonstrates that Hoskins knew exactly what he was doing. Thus, we conclude that the court did not err in granting Hoskins's *Faretta* motion.

## VI.

### *SENTENCING ISSUES*

A. *Gun Use Enhancements Under Section 12022.53*

The jury found true firearm use allegations attached to counts 2 and 3 for Simpson and count 10 for Ware. (§ 12022.53, subds. (b), (c), and (e)(1).) The court imposed sentences, of 20 years, and six years eight months for Simpson and 20 years for Ware. Effective January 1, 2018, approximately five months after the sentencing hearing, Senate Bill No. 620 amended sections 12022.5 and 12022.53 to provide that trial courts may, "in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed . . . ." (§§ 12022.5, subd. (c), 12022.53, subd. (h).) The new legislation granted trial courts discretion they did not previously possess to strike firearm enhancements. (*People v. Woods* (2018) 19 Cal.App.5th 1080, 1090.)

Simpson and Ware contend this matter should be remanded to allow the trial court the opportunity to exercise its discretion to strike the firearm use enhancements in accordance with section 12022.53, subdivision (h). The People concede, and we agree, that Ware's and Simpson's cases should be remanded to allow the trial court the opportunity to exercise its sentencing discretion under amended section 12022.53.

B. *Ware's Personal Gun Use Enhancement (Count 10)*

In count 10 the jury found Ware guilty of attempted premediated murder and found true a gang enhancement allegation under section 186.22, subdivision (b)(1), and two firearm enhancement allegations under sections 12022.53, subdivisions (b) and (e)(1), and 12022.53, subdivisions (c) and (e)(1). At sentencing, the trial court set the minimum parole eligibility

88

period for count 10 at 15 years, pursuant to subdivision (b)(5) of section 186.22. It also imposed and stayed a 10-year firearm enhancement under section 12022.53, subdivision (b), and imposed a 20-year firearm enhancement under section 12022.53, subdivision (c).

Ware asserts that the matter must be remanded for resentencing because he did not personally use the firearm in count 10; thus, he claims that the trial court was statutorily barred from imposing increased punishments under both section 186.22 and section 12022.53. The People concede the error and agree that the matter needs to be remanded for resentencing. We agree.

Under section 12022.53, a defendant's *personal use* of a firearm in the commission of a specified felony results in an additional 10-year prison term. (§ 12022.53, subd. (b).) The personal and intentional discharge of a firearm leads to an additional 20 years. (*Id.*, subd. (c).) Where, as here, the provisions of sections 186.22 and 12022.53 both apply, section 12022.53 explains how a trial court is to sentence a defendant, as follows:

> "The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of Section 186.22. [¶] (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)." (§ 12022.53, subd. (e)(1).)

However, subdivision (e)(2) of section 12022.53 provides: "An enhancement for participation in a criminal street gang . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, *unless the person personally used or personally discharged a firearm in the commission of the offense*." (Italics added.) Here, the jury did not find that Ware personally used or discharged a firearm; rather, he was an

accomplice to another principal who personally used or discharged a firearm.  In this situation, Ware is "subject to additional punishment under *either* section 12022.53 *or* the gang-related sentence increases under section 186.22, but not *both*."  (*People v. Brookfield* (2009) 47 Cal.4th 583, 593-594.)

As we discussed, we are remanding the matter to allow the trial court to exercise its discretion to strike Ware's firearm enhancement.  (*Ante*, pt. V.A.)  If the trial court elects to do so, it would be authorized to sentence under section 186.22.  Accordingly, remand is required for a new sentencing hearing, at which the trial court's authority to sentence under section 186.22 or section 12022.53 in count 10 will depend upon its exercise of discretion under subdivision (h) of the latter statute.

C. *Ware's Sentences for Conspiracy (Count 1) and Attempted Murder (Count 10)*

The jury found Ware guilty of conspiracy to murder suspected NC and WCC gang members (count 1).  It also found him guilty of attempted murder based on the March 25, 2014 shooting (count 10) where he drove his car into WCC territory and his passenger shot at a WCC gang member.  The trial court sentenced Ware to 25 years to life in prison for the conspiracy, plus an additional enhanced life term for the attempted murder.  Ware contends that section 654 barred the trial court from imposing sentences for both the conspiracy and the substantive offense because they shared the same objective.  The People disagree, arguing that Ware could be punished for both conspiracy and attempted murder because the conspiracy was not limited to the single attempted murder charged in count 10, but extended to an agreement to kill rival Crips gang members, spanning several years.  We agree with the People.

"Section 654 bars multiple punishment for separate offenses arising out of a single occurrence where all of the offenses were incident to one objective." (*People v. Lewis* (2008) 43 Cal.4th 415, 519, disapproved on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919-920.)  " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.  If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Correa* (2012) 54 Cal.4th 331, 336.)

"Because of the prohibition against multiple punishment in section 654, a defendant may not be sentenced 'for conspiracy to commit several crimes and for each of those crimes where the conspiracy had no objective apart from those crimes.  If, however, a conspiracy had an objective apart from an offense for which the defendant is punished, he may properly be sentenced for the conspiracy as well as for that offense.' [Citations.]  Thus, punishment for both conspiracy and the underlying substantive offense has been held impermissible when the conspiracy contemplated only the act performed in the substantive offense [citations], or when the substantive offenses are the means by which the conspiracy is carried out [citation].  Punishment for both conspiracy and substantive offenses has been upheld when the conspiracy has broader or different objectives from the specific substantive offenses." (*People v. Ramirez* (1987) 189 Cal.App.3d 603, 615-616, fn. omitted.)  The question whether defendant had the same objective in committing more than one offense is a question of fact for the trial court, and we review the court's finding under the substantial evidence standard.  (*People v. Osband* (1996) 13 Cal.4th 622, 730.)

91

In count 10, Ware aided and abetted the attempted murder of WCC gang member, M.W., on March 25, 2014.  Count 1 alleged that Ware conspired to murder suspected NC and WCC gang members with numerous coconspirators.  The charged conspiracy consisted of 104 overt acts, 13 of which were shootings, including the March 25, 2014 shooting.

The conspiracy charge had a broader objective beyond the attempted murder of the specific individual charged in count 10.  Where, as here, a conspiracy has "an objective apart from an offense for which the defendant is punished, [the defendant] may properly be sentenced for the conspiracy as well as for that offense."  (*In re Cruz* (1966) 64 Cal.2d 178, 181; see also, *People v. Amadio* (1971) 22 Cal.App.3d 7, 15 [conspiracy to receive stolen property included more than receipt of property in substantive counts]; *People v. Collins* (1966) 242 Cal.App.2d 626, 640 [conspiracy went beyond instances of theft for which defendant was convicted]; *People v. Scott* (1964) 224 Cal.App.2d 146, 152 [conspiracy lasted for months; evidence of numerous incidents other than those comprising the substantive offenses].)  The fact both count 1 and 10 had a single objective, killing a WCC or NC gang member, "does not bar multiple punishment for separate crimes."  (*People v. Lochmiller* (1986) 187 Cal.App.3d 151, 153.)  To accept Ware's argument would allow him to escape punishment that is commensurate with his culpability.  (See *People v. Latimer* (1993) 5 Cal.4th 1203, 1211, compare, *People v. Cavanaugh* (1983) 147 Cal.App.3d 1178, 1182 [multiple punishment is prohibited where the substantive offenses are merely the means of achieving the conspiracy's objective].)  Accordingly, the trial court did not err when it punished Ware for both the conspiracy and the attempted murder.

DISPOSITION

Simpson's and Hoskins's convictions for gang conspiracy, counts 6 and 7 are reversed. Simpson's and Ware's sentences are vacated. The matter is remanded for resentencing to: (1) resentence Hoskins and (2) allow the trial court to exercise its discretion to strike the firearm use enhancements attached to counts 2 and 3 for Simpson and count 10 for Ware pursuant to section 1385. (See § 12022.53, subd. (h).) If the trial court elects to exercise its discretion to strike the firearm enhancement as to Ware on count 10, the trial court is to resentence Ware on count 10 under section 186.22. In all other respects, the judgments are affirmed. After resentencing, the court shall prepare amended abstracts of judgment and forward certified copies to the Department of Corrections and Rehabilitation.


O'ROURKE, J.

WE CONCUR:


BENKE, Acting P. J.


HUFFMAN, J.


93

Filed 7/31/20

CERTIFIED FOR PARTIAL PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D072515 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD255884) |
| VICTOR WARE et al., | ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |
| Defendants and Appellants. | |

THE COURT:

The opinion in this case filed on July 21, 2020, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED in part.

IT IS HEREBY CERTIFIED that sections I.A, I.B, and I.C. of the opinion meet the standards for partial publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be partially published in the Official Reports.

BENKE, Acting P. J.

Copies to: All Parties